# MUGLER *v.* KANSAS.

## SAME *v.* SAME.

ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

Argued April 11, 1887. — Decided December 5, 1887.

## KANSAS *v.* ZIEBOLD.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

Argued October 11, 1887. — Decided December 5, 1887.

State legislation which prohibits the manufacture of spirituous, malt, vinous, fermented, or other intoxicating liquors within the limits of the State, to be there sold or bartered for general use as a beverage, does not necessarily infringe any right, privilege or immunity secured by the Constitution of the United States, or by the Amendments thereto.

The prohibition by the State of Kansas, in its Constitution and laws, of the manufacture or sale within the limits of the State of intoxicating liquors for general use there as a beverage, is fairly adapted to the end of protecting the community against the evils which result from excessive use of ardent spirits; and is not subject to the objection that, under the guise of police regulations, the State is aiming to deprive the citizen of his constitutional rights.

Lawful state legislation, in the exercise of the police powers of the State, to prohibit the manufacture and sale within the State of spirituous, malt, vinous, fermented, or other intoxicating liquors, to be used as a beverage, may be enforced against persons who, at the time, happen to own property whose chief value consists in its fitness for such manufacturing purposes, without compensating them for the diminution in its value resulting from such prohibitory enactments.

A prohibition upon the use of property for purposes that are declared by valid legislation to be injurious to the health, morals or safety of the community, is not an appropriation of property for the public benefit, in the sense in which a taking of property by the exercise of the State's power of eminent domain is such a taking or appropriation.

The destruction, in the exercise of the police power of the State of property used, in violation of law, in maintaining a public nuisance, is not a taking of property for public use, and does not deprive the owner of it without due process of law.

A State has constitutional power to declare that any place kept and main-

tained for the illegal manufacture and sale of intoxicating liquors shall be deemed a common nuisance, and be abated; and at the same time to provide for the indictment and trial of the offender.

There is nothing in the provisions of § 13 of the statute of the State of Kansas of March 7, 1885, amendatory of the act of February 19, 1881, so far as they apply to the proceedings reviewed in these cases, which is inconsistent with the constitutional guarantees of liberty and property; and the equity-power conferred by it to abate a public nuisance without a trial by jury is in harmony with settled principles of equity jurisprudence.

If the provision that in a prosecution by indictment or otherwise the State need not, in the first instance, prove that the defendant has not the permit required by the statute has any application to the proceeding in equity authorized by the statute of Kansas of 1881, as amended in 1885, it does not deprive him of the presumption that he is innocent of any violation of law; and does him no injury, as, if he has such permit, he can produce it.

The record does not present a case which requires the court to decide whether the statutes of Kansas forbid the manufacture of intoxicating liquors to be exported or carried to other States; or whether they are repugnant upon that ground to the clause of the Constitution of the United States giving Congress power to regulate commerce with foreign nations and among the several States.

THE constitution of the State of Kansas contains the following article, being art. 15 of § 10, which was adopted by the people November 2, 1880:

" The manufacture and sale of intoxicating liquors shall be forever prohibited in this State, except for medical, scientific, and mechanical purposes."

The legislature of Kansas enacted a statute to carry this into effect, the provisions of which are set forth by the court in its opinion in this case, to which reference is made. This statute took effect on the 1st of May, 1881.

The plaintiff in error, Mugler, the proprietor of a brewery in Saline County, Kansas, was indicted in the District Court in that county in November, 1881, for offences against this statute.

The first indictment against him contained five counts charging that he, on five different specified days in November, 1881, in the county of Saline " unlawfully did sell, barter, and give away spirituous, malt, vinous, fermented, and other intoxicating liquors," he " not having a permit to sell intoxicating liquors,

as provided by law, contrary to the statutes," &c.; and a sixth count charging that in Saline County, at a time named in that month, he "did unlawfully keep and maintain a certain common nuisance, to wit:" his brewery, then and there "kept and used for the illegal selling, bartering, and giving away, and illegal keeping for sale, barter, and use of intoxicating liquors, in violation of the provisions of an act," &c.

The parties made an agreed statement of facts, which was all the evidence introduced in the case, and which was as follows:

"It is hereby stipulated and agreed that the facts in the above-entitled case are, and that the evidence would prove them to be, as follows:

"That the defendant, Peter Mugler, has been a resident of the State of Kansas continually since the year 1872; that, being foreign born, he in that year declared his intention to become a citizen of the United States, and always since that time intending to become such citizen, he did, in the month of June, 1881, by the judgment of the District Court of Wyandotte County, Kansas, become a full citizen of the United States, and since that time has been a citizen of the United States and of the State of Kansas.

"That in the year 1877 said defendant erected and furnished a brewery on lots Nos. 152 and 154 on Third Street, in the city of Salina, Saline County, Kansas, for use in the manufacture of a malt liquor commonly known as beer; that such building was specially constructed and adapted for the manufacture of such malt liquor, at an actual cost and expense to said defendant of ten thousand dollars, and was used by him for the purposes for which it was designed and intended after its completion in 1877 and up to May 1, 1881.

"That of the beer so manufactured and on hand prior to February 19, 1881, said defendant made one sale since May 1, 1881, which is the sale charged in the first count of the indictment, said sale being made on the above-described premises; that the beer so sold was in the original packages in which it was placed after its manufacture, and was not sold for use nor used on said premises, and that at the time of such sale said

defendant had no permit to sell intoxicating liquors, as provided by chapter 128 of Laws of 1881."

Mugler was adjudged to be guilty, and was sentenced to pay a fine of one hundred dollars and costs, and motions for a new trial and in arrest of judgment were overruled. This judgment being affirmed by the Supreme Court of the State on appeal, the cause was brought here by writ of error on his motion.

The indictment in the second case charged that, on the first day of November, 1881, in Saline County he "did unlawfully manufacture, and aid, assist, and abet in the manufacture of vinous, spirituous, malt, fermented, and other intoxicating liquors, in violation of the provisions of an act," &c., he then and there "not having taken out and not having a permit to manufacture intoxicating liquors as provided by law, contrary to the statutes," &c.

The parties made the following agreed statement of facts which was all the evidence introduced in the case.

"It is hereby stipulated and agreed that the facts in the above-entitled case are, and that the evidence would prove them to be, as follows:

"That the defendant, Peter Mugler, has been a resident of the State of Kansas continually since the year 1872; that, being foreign born, he in that year declared his intention to become a citizen of the United States, and always since that time intending to become such citizen, he did, in the month of June, 1881, by the judgment of the District Court of Wyandotte County, Kansas, become a full citizen of the United States and of the State of Kansas.

"That in the year 1877 said defendant erected and furnished a brewery on lots Nos. 152 and 154 on Third Street, in the city of Salina, Saline County, Kansas, for use in the manufacture of an intoxicating malt liquor commonly known as beer.

"That such building was specially constructed and adapted for the manufacture of such malt liquor, at an actual cost and expense to said defendant of ten thousand dollars, and was used by him for the purposes for which it was designed and

intended after its completion in 1877 and up to May 1st, 1881. That said brewery was at all times after its completion and on May 1, 1881, worth the sum of ten thousand dollars for use in the manufacture of said beer, and is not worth to exceed the sum of twenty-five hundred dollars for any other purpose. That said defendant, since October 1, 1881, has used said brewery in the manner and for the purpose for which it was constructed and adapted by the manufacturing therein of such intoxicating malt liquors, and at the time of such manufactur; of said malt liquors said defendant had no permit to manufacture the same for medical, scientific, or mechanical purposes, as provided by chapter 128 of Laws of 1881."

The defendant was adjudged to be guilty, and was fined one hundred dollars and costs, and, as in the other case, motions for a new trial and in arrest of judgment were overruled, and the judgment being affirmed by the Supreme Court of the State of Kansas on appeal, the defendant sued out a writ of error to review it.

The assignment of errors in the first of these cases was as follows:

"*First.* Said court erred in affirming the judgment of the district court of Saline County, Kansas, that the defendant, Mugler, pay a fine of one hundred dollars for the alleged violation of a statute of said State, prohibiting the sale or barter of spirituous or malt liquors, except for medical, scientific, and mechanical purposes; said statute being in violation of Article 14 of the Constitution of the United States, which provides that 'no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny any person within its jurisdiction the equal protection of the laws.'

"*Second.* Said court erred in affirming the judgment of the district court of Saline County, Kansas, overruling the motion of defendant, Mugler, for a new trial, and in arrest of judgment, which motions should have been sustained."

In the second case the assignment was as follows:

"*First.* Said court erred in affirming the judgment of the

district court of Saline County, Kansas, that defendant Mugler, pay a fine of one hundred dollars for the alleged violation of a statute of Kansas, prohibiting the manufacture of spirituous or malt liquors by any person without having a permit to manufacture such liquors for medical, scientific, and mechanical purposes; said statute being in violation of Article 14 of the Constitution of the United States, which provides that 'no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law; nor deny any person within its jurisdiction the equal protection of the laws.'

" *Second.* Said court erred in affirming the judgment of the district court of Saline County, Kansas, overruling the motions of defendant, Mugler, for a new trial and in arrest of judgment, which motions should have been sustained, the statute under which said defendant was convicted being unconstitutional in that it attempts to deprive said defendant of the right to manufacture beer even for his own use, or for storage or transportation out of the State of Kansas, and also deprives defendant of his right to use his property for the manufacture of beer, without due process of law."

The causes were argued and submitted together at October Term, 1886.

*Mr. George G. Vest,* for plaintiff in error.

I. The statute of Kansas is in conflict with the 14th Amendment to the Constitution, where it declares that " no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The defendant was indicted for manufacturing beer, without having a license to manufacture for " medical, scientific, and mechanical purposes." There was no allegation in the indictment, and no proof or attempt to prove, that the beer was manufactured for sale or barter.

The naked proposition contained in the Kansas constitution and statute, is, that no citizen shall manufacture even for his own use, or for exportation, any intoxicating liquors.

The State has unquestionably the power to prohibit the manufacture, for sale or barter, of intoxicating liquors within its limits; it has the power to prohibit the manufacture of explosive substances, such as dynamite or nitro-glycerine, which from their nature are dangerous to the lives or property of others, but no convention or legislature has the right, under our form of government, to prohibit any citizen from manufacturing for his own use, or for export, or storage, any article of food or drink not endangering or affecting the rights of others.

In the implied compact between the State and citizen, certain rights are reserved by the latter, with which the State cannot interfere. These rights are guaranteed by the Federal and State Constitutions in the provisions of those instruments which protect "life, liberty, and property."

The doctrines of the Commune give to the State the right to control the tastes, appetites, and habits of the citizen: his dress, food, drink, domestic relations are controlled and regulated by the State. "The State is everything, the individual nothing." In order to make him a useful citizen and tax-payer, the State exercises a surveillance over all that he is and has.

On the other hand, our system of government, based upon the individuality and intelligence of the people, does not claim to control the citizen, except as to his conduct to others, leaving him the sole judge as to all that only affects himself.

The right to manufacture for his own use either food or drink is certainly an absolute or natural right, reserved to every citizen — one guarantee by the Fourteenth Amendment, and when, under the laws of Kansas he is punished for manufacturing beer, it "abridges his privileges as a citizen of the United States," it "deprives him of liberty and property without due process of law," and it denies him "the equal protection of the laws."

Civil liberty is defined by Blackstone to be "that of a member of society, and is no other than *natural liberty* so far re

strained by human laws (and no further) as is necessary and expedient for the general advantage of the public."

If the constitution and prohibitory statute of Kansas leave any residuum of *natural liberty* remaining anywhere, it will require microscopical inquiry to find it. If a State convention or legislature can punish a citizen for manufacturing beer, or wine, or bread, not to be sold or bartered or even given away, but for his own use, then instead of civil liberty, we are living under the most unlimited and brutal despotism known in history.

If a convention or legislature can enter into every man's house, and prescribe what he shall or shall not manufacture, ignoring entirely the question of whether he proposes to dispose of the article manufactured to others, or whether its manufacture is dangerous in the process of manufacturing to the lives or property of others, then it follows logically that the same power can prescribe the tastes, habits, and expenditure of every citizen.

In the *Slaughter-House Cases*, 16 Wall. 36, Mr. Justice Miller, in delivering the majority opinion, quotes approvingly Chancellor Kent's definition of the police power of the States. See also the opinions of Justices Bradley and Field, in *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746; *Commonwealth* v. *Alger*, 7 Cush. 53.

Broad and comprehensive as this power is, it cannot extend to the individual tastes and habits of the citizen, which are confined entirely to himself and have no effect upon others. *License Cases*, 5 How. 504, 583. Whatever may be the injurious results from the intemperate use of beer, or whatever the difference of opinion as to its sanitary qualities, it cannot be contended that there is anything in the process of manufacturing it which endangers the lives or property of others. *Corfield* v. *Coryell*, 4 Wash. C. C. 371. The constitution and statute of Kansas can only be defended on the ground that the State can take possession of the persons and property of its citizens absolutely, and so regulate and reform them as to produce the ideal father, husband, and tax-payer of the Commune.

Without entering into the questions so fully discussed in the Slaughter-House Cases as to the proper construction of the first clause of the Fourteenth Article of Amendment, the plaintiff in error confidently submits his case upon the contention that the prohibition statute of Kansas deprives him of "liberty and property without due process of law."

If we are right in the assumption that the citizen stands before the law in a dual character, both as an individual and a member of society; that in the former status he has certain natural rights not surrendered to society, but reserved to himself and necessary to his pursuit of happiness, and which the law cannot take away; that his right to manufacture any article of food or drink or apparel, provided the process of manufacturing does not endanger the lives or property of others, is one of these reserved or natural rights, then the statute of Kansas now in question is not "due process of law." As to what is "due process of law" see Cooley's Constitutional Limitations, 356; *Wynehamer* v. *People*, 13 N. Y. 378; *State* v. *Allen*, 2 McCord, Law, 55; *Sears* v. *Cottrell*, 5 Mich. 251; *Taylor* v. *Porter*, 4 Hill, 140; *S. C.* 11 Am. Dec. 274; *Hoke* v. *Henderson*, 4 Dev. 1; *S. C.* 25 Am. Dec. 677; *Janes* v. *Reynolds*, 2 Texas, 251; *Kennard* v. *Louisiana*, 92 U. S. 480; *Murray* v. *Hoboken Co.*, 18 How. 272; Mr. Webster's argument in *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Brown* v. *Hummell*, 6 Penn. St. 86; *Norman* v. *Heist*, 5 W. & S. 171; *S. C.* 40 Am. Dec. 493.

The general laws governing society guarantee to the citizen his right to manufacture beer, and until he attempts to sell or barter he cannot be punished. In this case the State of Kansas, by a legislative enactment, deprives the citizen of a right existing in all free governments, and only denied in unlimited despotisms. This cannot be "due process of law."

If it be said that the citizen is indicted, arrested, and tried by jury, before conviction, and that this constitutes "due process of law," our reply is that this is the mere machinery to enforce an unconstitutional statute. The mandate of the legislature is imperative, and robs the citizen of a privilege which, in a free government, cannot be denied. No discretion

is given the courts, but the constitution of Kansas, and the statute made, to furnish the means for enforcing it are absolute and mandatory. They declare that "the manufacture of intoxicating liquors shall be forever prohibited in the State, except for medical, scientific, and mechanical purposes."

Under the humane and just laws which obtain in all free governments, every reasonable intendment is made in favor of the accused, and the burden of proving his guilt rests upon the State. If all that is charged in the indictment be granted, what offence has been committed under the laws of any free people? For all that appears in the case the plaintiff in error manufactured the beer for his own use, or to be exported, or for storage. There is no evidence that he intended to sell or barter, or give to any citizen of Kansas. What right, then, or power existed in the authorities of that State to inflict punishment?

There has never been, and can never be, any question more important or more vital to the existence of civil liberty than that involved in this case. It is the question of the centuries, over and about which men have fought and suffered and died, until out of the dark and dreary struggle the great truth has been established that "the only freedom which deserves the name is that of pursuing our own good in our own way, so long as we do not attempt to deprive others, or impede their efforts to obtain it. Each is the proper guardian of his own health, whether bodily, mental, or spiritual. Mankind are greater gainers by suffering each other to live as seems good to themselves, than by compelling each to live as seems good to the rest." John Stuart Mill "On Liberty," 28, 29. See *Calder* v. *Bull*, 3 Dall. 386; *Fletcher* v. *Peck*, 6 Cranch, 87, 135; *Dash* v. *Van Kleeck*, 7 Johns. 477; *S. C.* 5 Am. Dec. 291; *Taylor* v. *Porter*, above cited; *Goshen* v. *Stonington*, 4 Conn. 209, 225; *S. C.* 10 Am. Dec. 121.

The claim that any legislative body in this country can absolutely destroy private rights and personal liberty, as in this case, is a monstrous assumption, at war with the established and axiomatic principles of free government.

No protest is made by the plaintiff in error against the

exercise of its constitutional discretion by the legislature. The courts are not asked to invade the legitimate province of the legislative department in its exercise of the police power. No claim of visionary and speculative natural rights outside of the written constitution is set up. Our contention is simply that no legislature has, under our form of government, the power to prohibit the citizen from manufacturing beer, unless that manufacture be for sale or barter to others, and when the citizen is deprived of such right by a mere legislative enactment it is not "due process of law."

II. The prohibition statute of Kansas deprives the plaintiff in error, directly and absolutely, of his property, without "due process of law." His brewery was built in 1877, for the purpose of manufacturing beer to be used as a beverage, a legitimate industry, then under the protection of law. By the statutory enactment of 1881 this property, worth $10,000 for the purpose to which it was adapted, is reduced to $2500 in value, not indirectly, or consequentially, but by direct prohibition of the real and primary use of the property. This question has never been directly adjudicated by this court. In *Bartemeyer* v. *Iowa*, 18 Wall. 129, an attempt was made to secure a ruling, but the court declined to consider the question.

Prior to the constitutional amendment, and prior to May, 1881, when the prohibition law took effect, Mugler had the right to manufacture beer without restriction as to the purpose for which it was to be sold or used. After that date the manufacture was forbidden, except for specified purposes, and the manufacturer was required to obtain a permit. It is admitted that he had no such permit, when he made beer after May 1, 1881. Had the legislature the constitutional power to take from him without compensation the use of his property, except for certain limited and specified purposes?

The majority of the Supreme Court of Kansas seem to have been impressed with the idea that so long as he was permitted to use his brewery for any purpose, no matter how restricted, he was not deprived of his property. This is a singular position. Every fair and candid mind will admit that the ordi-

nary, usual, and principal use of beer is as a beverage, and that its use for medical, scientific, or mechanical purposes is exceptional and rare. See *Wynhamer* v. *People*, above cited.

As well might it be claimed, that a hotel-keeper, who has constructed a valuable building for the entertainment of the public, is not deprived of his property, or its use, when forbidden by the legislature to entertain any guest unless an invalid. Such cavils are unworthy the importance of the question. Every intelligent observer knows that the statute of Kansas was enacted simply and solely to destroy the use of beer as a beverage, and for its supporters to take refuge behind the pretext that there was any other purpose, is an unfair and unworthy subterfuge. There is no pretence or claim that the legislature has not the right to prohibit the sale of beer, or its manufacture for sale or barter in the future, but that is very different from the question here presented, as to the power of the legislature to destroy the value of vested rights by legislative enactment without compensation, and without "due process of law."

Not satisfied with legislating for the future, the Kansas legislature has attempted to destroy property rights already vested, and created under laws enacted by the same authority. "That government can scarcely be deemed to be free where the rights of property are left wholly dependent upon the will of a legislative body without any restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred." *Wilkinson* v. *Leland*, 2 Pet. 627. See also Mr. Justice Field's opinion in *Munn* v. *Illinois*, 94 U. S. 113; Mr. Justice Bradley's concurring opinion in *Bartemeyer* v. *Iowa*, above cited; *Beer Company* v. *Massachusetts*, 97 U. S. 25.

That private property cannot be taken for public purposes, without just compensation to the owner, needs no argument or array of authorities. It is a fundamental maxim of all free governments, and essentially so of ours, that whenever the necessities of the public require that the property of a citizen shall be taken or destroyed, compensation must be made for the loss. The very nature of a government based upon the

idea that its citizens are equal participants in all 'its benefits and burdens implies this great truth.

The question was effectually disposed of by this court in *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166.

The Supreme Court of Kansas, or a majority of the court, came to the conclusion that the damages to plaintiff in error were so consequential. and remote that the case came within the class of cases described by Justice Strong in *Transportation Co.* v. *Chicago*, 99 U. S. 635.

In the work of Judge Cooley the result of all the authority, *pro* and *con*, is stated by him, as follows : " Any proper exercise of the powers of government which does not directly encroach upon the property of an individual, or disturb him in its possession or enjoyment, will not entitle him to compensation."

There is no disposition to controvert this rule, and it is evident that it does not affect the case now before the court. The property of plaintiff was neither taken under a proper exercise of governmental power, or indirectly. The right of plaintiff to manufacture beer as a beverage, vested in him by existing law, is taken away directly and absolutely by legislative enactment. Whilst he is left in possession of his brewery he is forbidden to use it for the principal, and in fact the only, purpose for which it was erected. By a simple act of the legislature, without judicial proceedings, he is deprived of three-fourths the value of his property, and is told by the State which invited him, with the pretext of equal and just laws, that the industry in which he has invested the savings of a life is illegal and immoral. There is no question here of consequential and remote damages. Nothing in the shape of legislation can be more direct or even brutal than the law of Kansas. It gives no time for preparation — no day in court — but sweeps away his right to manufacture by one single enactment.

It is deemed unnecessary to discuss further the meaning of the term " due process of law." That has been done in the first part of this argument, and nothing can be added to what is so forcibly expressed by Judge Brewer. That the questions

presented are of the gravest nature, and that great difference of opinion has arisen in regard to them admit of no doubt. Even so eminent and experienced a jurist as Judge Cooley, says: "Perhaps there is no instance in which the power of the legislature to make such regulations as may destroy the value of property, without compensation to the owner, appears in a more striking light than in the case of these statutes. The trade in alcoholic drinks being lawful, and the capital employed in it being fully protected by law, the legislature then steps in and by an enactment based on general principles of public utility annihilates the traffic, destroys altogether the employment, and reduces to a nominal value. the property on hand. Even the keeping of that for the purpose of sale becomes a criminal offence, and without any change whatever in his own conduct or employment the merchant of yesterday becomes the criminal of to-day, and the very building in which he lives and conducts the business, which to that moment was lawful, becomes the subject of legal proceedings, if the statute shall so declare, and liable to be proceeded against for a forfeiture. A statute which can do this must be justified upon the highest reasons of public benefit, but whether satisfactory or not they address themselves exclusively to the legislative wisdom."

The high character of the writer of the above as a jurist and commentator forbids the suspicion that he meant to declare that the legislature could so exercise the police power as to destroy vested rights of property without compensation, and that the citizen is left without redress in the courts. It is true that the legislature may, in its discretion, enact such laws as it may deem proper, but its power is limited by constitutional provisions, and there are personal and property rights beyond and above its control.

It is not claimed that the plaintiff in error, in the language of the learned judge who delivered the opinion of the Supreme Court of Kansas, "could go on with or without legislation, and with or without a license, manufacturing beer forever," or that, "he founds his right to continue to manufacture beer solely and exclusively upon his supposed vested right to oper-

ate his brewery in undisturbed tranquillity forever." No such claim has ever existed, except in the judicial imagination. But the plaintiff does claim, most earnestly and confidently, that his right to operate his brewery as vested in him by the laws of Kansas, cannot be taken away by the State without just compensation. For an exhaustive discussion of the question, see *Wynehamer* v. *People,* above cited; *Beebe* v. *State,* 6 Ind. 501; *S. C.* 63 Am. Dec. 391; *In the matter of Jacobs* (*Tenement House Cigar Case*), 98 N. Y. 98.

*Mr. B. S. Bradford,* Attorney General of the State of Kansas, *Mr. George R. Peck, Mr. J. B. Johnson,* and *Mr. George J. Barker* for defendant in error, submitted on their brief.

On the 7th March, 1885, the legislature of Kansas passed an act "amendatory of and supplemental to" the act of 1881. Among other changes made, § 13 was amended so as to read as shown in the footnote.[1]

---

[1] For convenience this section is reprinted here, although it will be found *infra,* in the opinion of the court.

"Sec. 13. All places where intoxicating liquors are manufactured, sold, bartered, or given away in violation of any of the provisions of this act, or where intoxicating liquors are kept for sale, barter, or delivery in violation of this act, are hereby declared to be common nuisances, and upon the judgment of any court having jurisdiction finding such a place to be a nuisance under this section, the sheriff, his deputy, or under sheriff, or any constable of the proper county, or marshal of any city where the same is located, shall be directed to shut up and abate such place by taking possession thereof and destroying all intoxicating liquors found therein, together with all signs, screens, bars, bottles, glasses, and other property used in keeping and maintaining said nuisance, and the owner or keeper thereof shall; upon conviction, be adjudged guilty of maintaining a common nuisance, and shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, and by imprisonment in the county jail not less than thirty days nor more than ninety days. The attorney general, county attorney, or any citizen of the county where such nuisance exists, or is kept, or is maintained, may maintain an action in the name of the State to abate, and perpetually enjoin the same. The injunction shall be granted at the commencement of the action, and no bond shall be required. Any person violating the terms of any injunction granted in such proceeding, shall be punished as for contempt, by a fine of not less than

On the 13th August, 1886, there was filed in the office of the District Court for the County of Atchison, Kansas, an information against Ziebold and his partner, who were proprietors of a brewery there. The information prayed that the brewery might be adjudged to be a common nuisance; that it be ordered to be shut up and abated; that the defendants be enjoined from using or permitting to be used the premises as a place where intoxicating liquors were sold, bartered, or given away, or were kept for barter, sale, or gift, otherwise than by authority of law; and that the defendants might be enjoined from keeping the brewery open, and from selling, bartering, or giving away, or keeping for sale, barter, gift, or use in or about the premises, or manufacturing for barter, sale, or gift in the State of Kansas, any malt, vinous, spirituous, fermented, or other intoxicating liquors, and from permitting such liquors to be sold, &c., or kept for sale, &c., or manufactured for sale, &c., in the State of Kansas. On the defendants' motion this case was removed to the Circuit Court of the United States, where an amended bill in equity was filed, praying for the relief asked for in the state court. After joinder of issue and hearing the Circuit Court dismissed the bill, from which decree the State appealed.

*Mr. S. B. Bradford*, Attorney General of the State of Kansas, *Mr. Edwin A. Austin*, Assistant Attorney General of that State, and *Mr. J. F. Tufts*, Assistant Attorney General for Atchison County, Kansas, for appellant submitted on their brief. October 25, 1887, *Mr. Bradford* moved the court to reopen the cause and reassign it for argument. October 26, 1887, the court denied the motion.

*Mr. Joseph H. Choate* for appellee. *Mr. Robert M. Eaton* and *Mr. John C. Tomlinson* were with him on his brief.

I. The entire scheme of the thirteenth section which attempts by mere legislative enactment to convert the building

one hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment, in the discretion of the court."

and machinery of the appellees into a common nuisance, and to compass their destruction, and also attempts to execute the criminal law against the persons of the appellees, by equitable proceedings instead of a common law trial, is an attempt to deprive these persons of their property and their liberty without "due process of law," and is therefore absolutely void; and the Circuit Judge was right in refusing to exercise the equity powers vested in the Circuit Court for either of such purposes.

A careful examination of the thirteenth section, in connection with the rest of the act, discloses that it is a distinct legislative scheme, additional to the ordinary methods of trial, conviction and punishment, provided by the other sections of the act, and strikes by novel methods at the property of those engaged in the manufacture, thus presenting a question which, so far as we can find, has never been considered by this court.

By this section the legislature, finding a brewery within the State in actual operation, —which up to the time of the passage of the act was a lawful and protected industry, — instantly, without notice, trial or hearing, by the mere exercise of its arbitrary caprice, declares it to be a common nuisance, and then prescribes the consequences which are to follow inevitably by judicial mandate commanded by the statute, and involving and permitting the exercise of no judicial discretion or judgment. The brewery being found in operation, the court is not to *determine* whether it is a common nuisance, but under the strict behest of the statute is to *find it* to be one. It is not the liquor made or the making of it which is thus enacted to be a common nuisance, but the place itself, including all the property used in keeping and maintaining the common nuisance — embracing the building, machinery, instruments and material without distinction. The judge having thus signed without inquiry — and it may be against the fact and against his own judgment — the edict of the legislature, the court is commanded, by its officers, to take possession of the place and shut it up; and, lest the possession of the court and the closing of the establishment should not be sufficient security against the continuance of the business, the abatement of t

nuisance is to be completed by the destruction, by the marshal, of all the property; and he has no discretion but to destroy the whole. He cannot stop short at the liquor, or the glasses, or the kegs, but must demolish all property used in keeping and maintaining the nuisance. Nor is all this destruction of property, by legislative edict, to be made as a forfeiture consequent upon conviction of any offence, but without the intervention of any real judicial action, and merely because the legislature so commands.

So much of the scheme of the section is directed against the property of the brewers, but what follows, directed against their personal liberty, is equally extraordinary.

By the 7th, 8th and 9th sections of the act, complete provision is made for the punishment *after conviction* of all who shall either manufacture or sell without a permit, or, having a permit, shall sell for any but the excepted purposes. But the thirteenth section provides that in an *equitable* action, commenced for the abatement of the nuisance, which may be instituted by the Attorney General, county attorney, or any citizen of the county where the nuisance exists, an *injunction* shall issue at the commencement of the action, which of course can only be an injunction against the *crimes* of manufacturing and selling; and as all liquors that are manufactured or sold must be manufactured or sold in some place, it may apply to any offenders. And for a violation of the *injunction*, that is, for the *crime* of manufacturing or selling, punishment as for *contempt*, by the process of a court of *equity*, is to follow, which *may be a much more severe penalty than is prescribed as the. penalty upon trial and conviction* for keeping or maintaining the nuisance, for the latter may be a fine of five hundred dollars and imprisonment in the county jail, not more than *ninety days*, while the former may be an *equal fine* and imprisonment for *six months*.

The act does not make the trial and conviction for keeping and maintaining the nuisance a condition precedent to its abatement, or to the suit in equity in which these penalties may be inflicted; but, as in the case of these appellees, *equity invoked at the outset*, to register the edict of the legislature,

that the place is a common nuisance, to take possession of the property and destroy it, and *to punish the criminals* by fine and imprisonment.

As to the proceedings *in rem* for the condemnation, forfeiture, and destruction of the property as a punishment for the *crime* of using it for the manufacture of beer, if the legislature really intended to accomplish that purpose, as the present case assumes, without any conviction first had, or any trial in a form known to the law, by the intervention of a *court of equity*, in a bill filed against the owners, we submit that it is a clear case of depriving the owners of their property without due process of law; and this, assuming that it is within the proper province of the legislature to prohibit within the State all traffic in intoxicating liquors, and to declare the manufacture and sale of them to be nuisances.

In connection with § 13, and as regulating the proceedings which are provided by it, to culminate in the confiscation and destruction of the property, it is to be especially noted that § 14, amending original § 21, expressly provides for all cases that "it shall not be necessary in the first instance for the State to prove that the party charged did not have a permit to sell intoxicating liquors for the excepted purposes;" *i.e.*, that the State shall not be required to prove the one fact which constitutes the offence intended to be punished by the act by loss of liberty and of property; and the presumption of innocence is thus taken away from the party charged.

In *Fisher* v. *McGirr*, 1 Gray, 1, *S. C.* 61 Am. Dec. 381, which brought under review the prohibitory act of Massachusetts of 1852, principles are laid down in the unanimous opinion of the Court, delivered by Shaw, C. J., which are entirely applicable to the case at bar.

And *there* the only attempt of the legislature was to confiscate and destroy the property as a forfeiture and penalty by way of punishment, after trial and conviction of the owner. *Here* the proposition is, that, *without any proceeding at common law* to charge the owner or keeper with a violation of the statute, in a proceeding begun by a *bill in equity*, in which it shall not be necessary to allege, or on the trial *in equity* to

prove, the *one indispensable fact* constituting the offence to be punished, viz. : " That the party charged did not have the permit to sell intoxicating liquors for the excepted purposes," the punishment of forfeiture and destruction of property may be inflicted by the decree of a court of *equity*.

Surely this is a novel mode of administering *criminal law*. And that it is *criminal law* that is here being administered there can be no doubt. See also *Greene* v. *Briggs*, 1 Curtis, 311, 328; *Hibbard* v. *The People*, 4 Mich. 126, 129 ; *Neitzell* v. *Concordia*, 14 Kansas, 443 ; *Boyd* v. *United States*, 116 U. S. 616.

We submit, therefore, that it was not within the power of the legislation of Kansas, by resorting to the device of *enacting* a brewery in operation to be a nuisance, to enable a court of equity by its decree to convict a citizen of a crime, and to punish him by the confiscation and destruction of his property. Rights of property cannot be in this way " arbitrarily or capriciously destroyed or injured." *Yates* v. *Milwaukee*, 10 Wall. 497, 504, 505 ; *Hutton* v. *Camden*, 39 N. J. Law (10 Vroom), 122, 129, 130 ; Cooley on Const. Lim. (5th ed.), p. 110, and cases cited. *Lowrey* v. *Rainwater*, 3 Missouri App., 563 ; *S. C.* 70 Missouri, 152 ; *Ieck* v. *Anderson*, 57 Cal. 251.

Such a legislative determination would also be void, because, where the *fact* of injury to public health or morals did not exist, as here, it would be an interference with the absolute right of every American citizen to adopt and follow such pursuit as he sees fit, provided it be *not, in fact, " injurious to the community."* *People* v. *Marx*, 99 N. Y. 377, 386, and cases cited.

Here, the legislative edict is to be carried out, not through the instrumentality or machinery of a municipal government, but through the agency of a court of equity, which is to act, *not as a court of justice*, but simply as a legislative agent, to register the decrees of a legislative body. Such legislation has been held to be unconstitutional. *Quintini* v. *St. Louis*, 1 Southern Rep. 625.

As to the proceedings against the *person*, the provisions of the thirteenth section are in equally flagrant violation of the

constitutional mandate that no State shall "deprive any person of life, liberty or property *without due process of law.*" They are simply a method contrived to punish *crime, without a trial,* by the intervention of a *court of equity.*

It is a clear case of fine and imprisonment inflicted by statute for crime committed, but all safeguards known to the common law for the protection of innocence denied, and the office of imposing it conferred upon a *court of equity,* so as to avoid a trial by jury. As well might the State assume to treat and punish any other crime in the same fashion; and what would be thought of an act of the state legislature authorizing a court of equity to issue an injunction against theft or burglary and to punish the offence, when committed as a contempt, by fine and imprisonment, the amount and term of which was measured out by the statute?

As applicable both to proceedings against the property and to those against the person, under this thirteenth section, it may be stated as a general proposition, requiring little argument for its support, that the criminal law cannot be administered by or through courts of equity. The jurisdiction of a court of equity in cases of public nuisance, properly so called, is exceptional, and extremely limited in its application. Even in cases where the jurisdiction can be invoked "the question of *nuisance or not* must, in cases of doubt, be *tried by a jury;* and the injunction will be granted or not *as that fact is decided.*" 2 Story's Eq. Jur. § 923. In practice, this jurisdiction is applied almost exclusively to nuisances in the nature of *purprestures* upon public rights and property, as, for instance, encroachments upon highways, public rivers, streets, squares, bridges, docks and other public accommodations, and is exercised chiefly through an information at the suit of the Attorney General. 2 Story's Eq. Jur. §§ 921–924. But this jurisdiction is not exercised on any idea that the nuisance in question is a *crime,* or with a view of preventing or punishing a criminal act. 1 Bish. Crim. Proc. § 1417. And this is so for the very reason that, as Lord Eldon said, *a court of equity " has no jurisdiction in matters of crime." Lawrence* v. *Smith,* Jacob, 471, 473. See also *Hudson* v. *Thorne,* 7 Paige, 261; *Davis* v. *American Society, &c.,* 75 N. Y. 362.

With these general principles in mind as constituting "*the settled course of judicial proceedings*," that is, "due process of law," *Murray* v. *Hoboken Co.*, 18 How. 272, 280; *Walker* v. *Sauvinet*, 92 U. S. 90, 93, the Fourteenth Amendment to the Federal Constitution was adopted, providing that no State shall "deprive any person of life, liberty or property without *due process of law.*" "On principle, therefore," as Bishop says, "*this provision secures jury trial* in the States in all cases in which at the time of its adoption such trial was deemed a fundamental right." 1 Bish. Crim. Proc. § 891.

Accepting in its narrowest sense this court's definition of "due process of law" in *Walker* v. *Sauvinet*, 92 U. S. above cited, we find that it was settled in Kansas when these proceedings were commenced that "the settled course of judicial proceedings" involved the right to a trial by jury in every criminal case. Such a trial was provided for in the constitution of the State, §§ 5 and 10 of the Bill of Rights, and the Supreme Court of that State has held that no legislation is valid which conflicts with those provisions. *Atchison Street Railway* v. *Missouri Pacific Railway*, 31 Kansas, 660.

It is also firmly established in that State, as elsewhere, that these provisions mean that "A jury trial is preserved in *all cases in which it existed prior to the adoption of the constitution.* It does not extend the trial by jury, it simply *preserves* it. It remains inviolate; that is, not disturbed or limited." *In re Rolf's Petitioner*, 30 Kansas, 758, 762 ; *Kimball* v. *Connor*, 3 Kansas, 414, 432; *Ross* v. *Commissioners*, 16 Kansas, 411, 418; and that a prosecution for a matter made penal by the laws of the State, as *for selling liquor without a license*, is "*unquestionably a criminal action.*" *Neitzell* v. *Concordia*, 14 Kansas, 446; *In re Rolf*, above cited.

It would seem that nothing more need be said. If the legislature cannot accomplish *indirectly* what it cannot do directly, how is it possible for it to deprive a party of his right to a jury trial simply by authorizing a court of equity to take jurisdiction of the particular case? It is submitted, therefore, that there is not the slightest doubt that, by the statute in question, the legislature of Kansas has violated fundamen-

tal principles, the "settled course of judicial proceedings," and the law of the land, and that the statute is therefore unconstitutional and void.

If the propositions already expressed should meet with the approval of the court, they would necessarily be decisive of the case, and require the affirmance of the decree appealed from. As a law of criminal procedure applied to the punishment of offenders against its provisions, it would be held to be a fatal departure from "due process of law," and therefore void.

And, upon the one point, that the provision of the fourteenth section, which "in all cases" dispenses with proof in the first instance on the part of the State, that the party charged did not have a permit, which is "the one indispensable fact" constituting crime under the act, thereby taking away the presumption of innocence, which is the fundamental right of every person charged with crime, not only is the thirteenth section unconstitutional and void, but all other parts of the act are equally so.

II. Within the meaning of the Fourteenth Amendment this act deprived the appellees of their liberty and property without due process of law, and abridged the privileges and immunities of the appellees as citizens of the United States.

We claim also as part of this proposition, and in support of it, that at the time of the passage of the act, it was one of the fundamental rights of the appellees as citizens to pursue their calling of manufacturing beer and to use their brewery for that purpose, and that the State could only restrain the exercise of this right by virtue of the police power; that that power could only be exercised to the extent reasonable and necessary for the promotion of the object for which it was exercised, viz., the preservation and promotion of the morals and the health of the people of Kansas; that this act goes far beyond what is so necessary and reasonable, and that in such excess it invades the rights of the appellees and deprives them of their property; that it destroys their property for the public use other than for police purposes; that it does this without compensation.; that such destruction, not demanded by any legitimate exercise of

the police power, is depriving them of their property without due process of law.

At the outset, it should be borne in mind that "constitutional provisions for the security of person and property should be liberally construed." It is the duty of the courts to be watchful of constitutional rights and "against any stealthy encroachments thereon." *Boyd* v. *United States*, 116 U. S. 635. As to the general intent of the Fourteenth Amendment, "that there should be no *arbitrary deprivation* of life or liberty, or *arbitrary spoliation* of property," see *Barbier* v. *Connolly*, 113 U. S. 27, 31; *Yick Wo* v. *Hopkins*, 118 U. S. 356.

Assuming the question presented in this case to be wholly open, we submit with deference that the only principle that saves from condemnation, as abridging the privileges and immunities of citizens of the United States, or depriving persons of their property without due process of law, state statutes which invade the peaceful occupations of citizens and the use by them of their property for purposes theretofore permitted and lawful, is the proper exercise of the police power by *legitimate and constitutional methods*; that, so far as such statutes do go beyond such proper exercise and outside of such *methods*, at any rate, they do still violate the Fourteenth Amendment, and entitle citizens, whose privileges are thereby abridged, to protection; that, when citizens are thereby deprived of their property, they are still deprived of it *without due process of law*, even though the power working that deprivation be called the *police power*; and that the present statute of Kansas, so far, at any rate, as it prohibits the use by the appellees of their brewery for the manufacture of beer, and enacts their building and machinery to be a public nuisance, and dooms it to *destruction* by the mere *fiat* of the legislature, does transcend any legitimate exercise of the police power in regulating or prohibiting the *traffic* in intoxicating liquors, and is therefore void.

That there is a limit to the exercise of the police power in invading business and property in any given case, and that that limit is found in what is necessary and reasonable for guarding against the evil which injures or threatens the public welfare in the given case, and that the legislature cannot,

under the guise or pretext of a police regulation, go beyond that limit, and strike down innocent occupations and invade private property, the destruction and invasion of which are not reasonably necessary to accomplish the needed relief or the needed reform, are propositions sustained by abundant authority; and this, though allowing the legislature to be in each case the judge of the extent to which the existing evil is to be regulated or prohibited.

Now, allowing the legislature of Kansas to be the sole judge of how far they shall go in reforming the morals and the habits and regulating the appetites and prescribing the food and the drink of the people of Kansas, they certainly are not to be permitted to regulate the morals and the habits or the food and drink of the rest of the people of the United States, or the rest of mankind; and when, under guise of a liquor law for their own people, they strike down occupations and deprive persons of property, which have no tendency even to affect the temperance of the inhabitants of Kansas, they do exceed their recognized powers, and come in conflict with the Fourteenth Amendment.

Where the occupation or property is *in itself* immoral or noxious to health or to safety, we make no question of the power of the legislature to lay its hand upon them, and even in a proper case, to put them out of the way, and, where necessary, to destroy them.

Nor do we need to gainsay any of the familiar propositions of law cited, and relied upon in the brief on the part of the State.

But, in the light of the decisions in *Fletcher* v. *Peck,* 6 Cranch, 87, 135; *Calder* v. *Bull,* 3 Dall. 386; *Lake View* v. *Rose Hill Cemetery Co.,* 70 Ill. 191; *Railway Co.* v. *Jacksonville,* 67 Ill. 37; Brewer, J., in *Intoxicating Liquor Cases,* 25 Kansas, 751, 765; *Tenement House Cigar Case,* 98 N. Y. 98; and *People* v. *Marx,* above cited, we respectfully insist that the prohibitory statute of Kansas, so far as it goes beyond everything that can fairly tend to protect the morals and the habits of the people of Kansas, and absolutely prohibits the appellees from *manufacturing* beer at their brewery for sale

in other States and countries, and especially so far as it enacts their buildings and machinery to be a common nuisance, and condemns them to *confiscation and destruction*, exceeds the bounds of any proper exercise of the police power, and has gone beyond the utmost verge of constitutional power, and to that extent, at least, deprives the appellees of their property without "due process of law," and abridges their rightful privileges and immunities as citizens.

It will not be pretended that the mere existence of the brewery in operation, or the mere existence of beer therein in the vats or in the original packages, not intended for sale or consumption *in the State*, is in any way detrimental to the safety, the health, or the morals of the people of Kansas, or tends in the remotest degree in that direction; or that its destination to the *other markets* of the country, or the world, is not entirely consistent with the complete and perfect prevention of its sale and consumption *within the State*.

Nor is there anything in the conduct of the business of brewing, or the presence of the beer in vats, or in the original packages in the brewery, not intended for sale or consumption *within the State*, which is in the least akin to the unwholesome trades and occupations cited by Chancellor Kent in the passage so often referred to; nor can it be said that there is anything immoral in the business of brewing, or in its product. On the contrary, the legislature of Massachusetts in June, 1789, passed "*An act to encourage the manufacture and consumption of strong beer, ale, and other malt liquors.*"

There can be no doubt that the absolute prohibition by statute of the use of the appellee's brewery, which was owned by them before the enactment, does in the sense of the law actually deprive them of their property as completely as if the fee in nine-tenths of it were destroyed and blotted out of existence by the same enactment. The proofs show this, and it is practically conceded by the brief on the part of the State. It destroys fifty-five thousand dollars out of their sixty thousand of property.

This can hardly be an open question in this court since its decision in the case of *Pumpelly* v. *Green Bay Company*, 13

Wall. 166, 177, where the question of what amounts to "depriving a person of property" was plumply decided.

In that case, it was held that the flooding of the plaintiff's lands by a dam erected by the defendant company, was in effect and in law, a *taking* of his property. And though there may be a great difference between "taking property" without compensation, and "depriving a person of his property without due process of law," in many points of view there can be no doubt that "taking a man's property" is "depriving him of it," and that the same language must have been used by the court and the same result reached if it had been applying the constitutional provision against the latter wrong as it did use in applying that provision against the former. See also *Munn* v. *Illinois*, 94 U. S. 113, 141; *Babcock* v. *Buffalo*, 56 N. Y. 268; *Chenango Bridge Co.* v. *Paige*, 83 N. Y. 178, 189.

If, then, we have established that the act, so far as it exceeds the legitimate and necessary exercise of the police power, by prohibiting the use of the defendants' brewery for the manufacture of beer to be sold without the State, is unconstitutional, because it deprives the appellees of their previously acquired property without due process of law, it must follow that the entire prohibitions of the act, as against manufacture, are invalid because it makes no distinction between the prohibition which it is within the power of the State to impose, and that which is in excess of its lawful authority. The courts cannot be left to determine in each case whether the implicated brewer or brewery is within the intent of the act, or make guilt or innocence depend upon an intent on which the act does not itself make it dependent, viz., the intent to sell the beer within or without the State.

The case is not one where the part of the statute as to manufacture which is constitutional can operate independently of that part which is unconstitutional. But a vital part of the prohibition of the act being unconstitutional, and the act itself affording no means of discriminating them from the rest, the whole must fall together. See *Wynehamer* v. *People*, 13 N. Y. (3 Kern.) 378.

III. But if the power and authority of the state legislature

to prohibit the manufacture of beer, whether for sale outside of the State, or within it, shall be held to be absolute and unlimited, then we submit, upon the doctrines maintained by the Court of Appeals of New York in the case of *Wynehamer* v. *People, supra*, and by the Circuit Judge below, that in its application to the appellees' brewery, owned, possessed and used by them when the act took effect, the statute of Kansas violates the Fourteenth Amendment, because it deprives them of their property " without due process of law."

Assuming the act to be an absolute prohibition of brewing, and upholding it as such at the moment of its passage, it did deprive the appellees of their property by destroying the only use for which it was designed, and of which it was capable, which was as complete a deprivation as if the fee itself had been forfeited to the State. By the immediate operation of the statute, without any act committed by the appellees in violation of its provisions, the legal existence which the law and the Constitution designate as property is destroyed, and the private injury is as completely effected as if the thing itself were physically taken away.

When this law was passed, the brewery, and its use for the only purpose of which it was susceptible, was property in the most absolute and unqualified sense of the term, and as such as much entitled to the protection of the Constitution as lands, houses, or chattels of any description. The Constitution makes no discrimination between different kinds of property, and if protected by the Constitution from such legislation as we are now considering, it is protected because it is property innocently acquired under existing laws, and not upon any theory of its comparative utility.

If the good of the community requires the owner to be deprived of it for any purpose of public benefit, no matter what, common justice requires that compensation should be made for it, and any statute which does directly take it away from the owner for the uses of the public without compensation, deprives him of it without due process of law.

What Sir William Blackstone wrote a century ago is certainly as applicable now to property which exists under the

protection of this constitutional provision as it was then to property in England, which had no such shield against legislative encroachment: "So great is the regard of the law for private property that it will not authorize the least violation of it; no, *not even for the general good of the whole community.* In vain may it be urged that the good of the individual ought to yield to that of the community, for it would be dangerous to allow any private man or even any public tribunal to be the judge of this common good and to decide whether it be expedient or not. Besides, the public good is in nothing more essentially interested than in the protection of every individual's private rights as modelled by the municipal law. The legislature alone can and frequently does interfere and compel the individual to acquiesce. But how does it interpose and compel? *Not by absolutely stripping the subject of his property in an arbitrary manner, but by giving him a full indemnity and equivalent for the injury thereby sustained.*" (1 Bl. Com. 139.)

For all the purposes of the present argument the act should be construed as if it read: "To enable the State to administer and enforce its other laws against the use of intoxicating liquors, every brewery in the State from and after the date when this act takes effect shall be at once and forever closed." From the moment the act took effect the brewery of the appellees could not be kept open for a single instant with a view to its use for any purpose except the practically impossible one of a brewing for medical, scientific, or mechanical purposes. *De minimis non curat lex.* The infinitesimal exception establishes the sweeping universality of the prohibition of the act.

The effect of the statute attempted in New York on manufactured liquor existing at the time of its passage, all right of sale or use of which was taken away, although the title and possession was left with and in the owner, was demonstrated by Judge Comstock in his opinion to be depriving the owner of his property "without due process of law," and no successful answer has ever been made, nor can any as we believe be made to this argument. His definition of "due process of law," as used in the Constitution and as applicable to such cases, has never been surpassed. 13 N. Y. (3 Kern.) p. 392.

See also *Norman* v. *Heist*, 3 W. & S. 171; *Taylor* v. *Porter*, 4 Hill. 140; *S. C.* 11 Am. Dec. 274; *Hoke* v. *Henderson*, 4 Devereaux Law, 1; *S. C.* 25 Am. Dec. 677.

Tested by these authoritative definitions the statute of Kansas, as it operates upon the appellees' brewery without awaiting any act or violation of law on their part, cannot itself be set up as "due process of law." By the mere operation of the law itself, without anything more, the actual and commercial value of the property is annihilated. It cannot be *used;* it is made unlawful to use it; for a single moment's use attempted after the act takes effect all legal protection is withdrawn from it; it becomes a public nuisance and is doomed to actual destruction.

According to the doctrine so emphatically laid down by this entire court in the *Pumpelly* case, and repeated in substance by Mr. Justice Field in the case of *Munn* v. *Illinois*—all that is beneficial in property is the use and enjoyment of it; the use is the property, and if that is taken away, it matters not that the empty husks of title and possession are left with him who was once the owner.

*Mr. George G. Vest* for appellees, in addition to the points made by him in *Mugler's Case*, contended as follows: If the constitutional amendment and statutes of Kansas prohibit the manufacture of beer, for exportation or storage or personal use, they violate the Federal Constitution by denying rights which belong to every citizen as a citizen of the United States.

It will not do for opposing counsel to say that "if the property used by the defendants is of undiminished value if used for the purpose of manufacturing for barter, sale, and gift in other parts of the sovereignty of the United States, and if, by these proceedings, the defendants are not restricted in the use and enjoyment of these premises for such purposes, then they are not deprived of their property or of the use of it or of any value within the guarantee of the Fourteenth Amendment."

The constitutional amendment and statutes of Kansas, which constitute the basis of this action, and without which it cannot exist, do not stop at prohibiting the manufacture of beer for

barter and sale in Kansas, but they absolutely prohibit the manufacture in the State except for three specified objects, in which the manufacture for sale and barter in other States is not included.

These enactments must stand or fall upon their own legal effect, and not upon the changing and uncertain pleadings of prosecuting officers.

We concede freely that the Fourteenth Article of the Federal Constitution is intended to protect the rights of individuals as citizens of the United States, but no State has the power to deprive any such citizen of the right to manufacture any article, unless its manufacture endangers or injures the lives or property of others.

The police power is given the States to protect the health and morals of its citizens; but no convention or legislature can, under the guise of exercising this power, take from the citizen his right to manufacture beer, unless the process of its manufacture or the existence of the beer afterwards injuriously affects others. It is not pretended that these effects follow; and, without them, the power does not exist.

Mr. Justice HARLAN delivered the opinion of the court.

These cases involve an inquiry into the validity of certain statutes of Kansas relating to the manufacture and sale of intoxicating liquors.

The first two are indictments, charging Mugler, the plaintiff in error, in one case, with having sold, and in the other, with having manufactured, spirituous, vinous, malt, fermented, and other intoxicating liquors, in Saline County, Kansas, without having the license or permit required by the statute. The defendant, having been found guilty, was fined, in each case, one hundred dollars, and ordered to be committed to the county jail until the fine was paid. Each judgment was affirmed by the Supreme Court of Kansas, and thereby, it is contended, the defendant was denied rights, privileges, and immunities guaranteed by the Constitution of the United States.

The third case — *Kansas* v. *Ziebold & Hagelin* — was commenced by petition filed in one of the courts of the State. The relief sought is: 1. That the group of buildings in Atchison County, Kansas, constituting the brewery of the defendants, partners as Ziebold & Hagelin, be adjudged a common nuisance, and the sheriff or other proper officer directed to shut up and abate the same. 2. That the defendants be enjoined from using, or permitting to be used, the said premises as a place where intoxicating liquors may be sold, bartered, or given away, or kept for barter, sale, or gift, otherwise than by authority of law.

The defendants answered, denying the allegations of the petition, and averring: *First.* That said buildings were erected by them prior to the adoption, by the people of Kansas, of the constitutional amendment prohibiting the manufacture and sale of intoxicating liquors for other than medicinal, scientific, and mechanical purposes, and before the passage of the prohibitory liquor statute of that State. *Second.* That they were erected for the purpose of manufacturing beer, and cannot be put to any other use; and, if not so used, they will be of little value. *Third.* That the statute under which said suit is brought is void under the Fourteenth Amendment of the Constitution of the United States.

Upon the petition and bond of the defendants the cause was removed into the Circuit Court of the United States for the District of Kansas upon the ground that the suit was one arising under the Constitution of the United States. A motion to remand it to the state court was denied. The pleadings were recast so as to conform to the equity practice in the courts of the United States; and, the cause having been heard upon bill and answer, the suit was dismissed. From that decree the State prosecutes an appeal.

By a statute of Kansas, approved March 3, 1868, it was made a misdemeanor, punishable by fine and imprisonment, for any one, directly or indirectly, to sell spirituous, vinous, fermented, or other intoxicating liquors, without having a dram-shop, tavern, or grocery license. It was also enacted, among other things, that every place where intoxicating liquors

were sold in violation of the statute should be taken, held, and deemed to be a common nuisance; and it was required that all rooms, taverns, eating-houses, bazaars, restaurants, groceries, coffee-houses, cellars, or other places of public resort where intoxicating liquors were sold, in violation of law, should be abated as public nuisances. Gen. Stat. Kansas, 1868, c. 35, § 6.

But, in 1880, the people of Kansas adopted a more stringent policy. On the 2d of November of that year, they ratified an amendment to the state constitution, which declared that the manufacture and sale of intoxicating liquors should be forever prohibited in that State, except for medical, scientific, and mechanical purposes.

In order to give effect to that amendment, the legislature repealed the act of 1868, and passed an act, approved February 19, 1881, to take effect May 1, 1881, entitled "An act to prohibit the manufacture and sale of intoxicating liquors, except for medical, scientific, and mechanical purposes, and to regulate the manufacture and sale thereof for such excepted purposes." Its first section provides "that any person or persons who shall manufacture, sell, or barter any spirituous, malt, vinous, fermented, or other intoxicating liquors shall be guilty of a misdemeanor: *Provided, however,* That such liquors may be sold for medical, scientific, and mechanical purposes, as provided in this act." The second section makes it unlawful for any person to sell or barter for either of such excepted purposes any malt, vinous, spirituous, fermented, or other intoxicating liquors without having procured a druggist's permit therefor, and prescribes the conditions upon which such permit may be granted. The third section relates to the giving by physicians of prescriptions for intoxicating liquors to be used by their patients, and the fourth, to the sale of such liquors by druggists. The fifth section forbids any person from manufacturing or assisting in the manufacture of intoxicating liquors in the State, except for medical, scientific, and mechanical purposes, and makes provision for the granting of licenses to engage in the business of manufacturing liquors for such excepted purposes. The seventh section declares it to be a

misdemeanor for any person, not having the required permit. to sell or barter, directly or indirectly, spirituous, malt, vinous, fermented, or other intoxicating liquors ; the punishment prescribed being, for the first offence, a fine not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than twenty nor more than ninety days; for the second offence, a fine of not less than two hundred nor more than five hundred dollars, or imprisonment in the county jail not less than sixty days nor more than six months ; and for every subsequent offence, a fine not less than five hundred nor more than one thousand dollars, or imprisonment in the county jail not less than three months nor more than one year, or both such fine and imprisonment, in the discretion of the court.    The eighth section provides for similar fines and punishments against persons who manufacture, or aid, assist, or abet the manufacture of any intoxicating liquors without having the required permit.    The thirteenth section declares, among other things, all places where intoxicating liquors are manufactured, sold, bartered, or given away, or are kept for sale, barter, or use, in violation of the act, to be common nuisances; and provides that upon the judgment of any court having jurisdiction finding such place to be a nuisance, the proper officer shall be directed to shut up and abate the same.

Under that statute, the prosecutions against Mugler were instituted.    It contains other sections in addition to those above referred to; but as they embody merely the details of the general scheme adopted by the State for the prohibition of the manufacture and sale of intoxicating liquors, except for the purposes specified, it is unnecessary to set them out.

On the 7th of March, 1885, the legislature passed an act amendatory and supplementary to that of 1881.    The thirteenth section of the former act, being the one upon which the suit against Ziebold & Hagelin is founded, will be given in full in a subsequent part of this opinion.

The facts necessary to a clear understanding of the questions, common to these cases, are the following : Mugler and Ziebold & Hagelin were engaged in manufacturing beer at

their respective establishments, (constructed specially for that purpose,) for several years prior to the adoption of the constitutional amendment of 1880. They continued in such business in defiance of the statute of 1881, and without having the required permit. Nor did Mugler have a license or permit to sell beer. The single sale of which he was found guilty occurred in the State, and after May 1, 1881, that is, after the act of February 19, 1881, took effect, and was of beer manufactured before its passage.

The buildings and machinery constituting these breweries are of little value if not used for the purpose of manufacturing beer; that is to say, if the statutes are enforced against the defendants the value of their property will be very materially diminished.

The general question in each case is, whether the foregoing statutes of Kansas are in conflict with that clause of the Fourteenth Amendment, which provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law."

That legislation by a State prohibiting the manufacture within her limits of intoxicating liquors, to be there sold or bartered for general use as a beverage, does not necessarily infringe any right, privilege, or immunity secured by the Constitution of the United States, is made clear by the decisions of this court, rendered before and since the adoption of the Fourteenth Amendment; to some of which, in view of questions to be presently considered, it will be well to refer.

In the *License Cases*, 5 How. 504, the question was, whether certain statutes of Massachusetts, Rhode Island, and New Hampshire, relating to the sale of spirituous liquors were repugnant to the Constitution of the United States. In determining that question, it became necessary to inquire whether there was any conflict between the exercise by Congress of its power to regulate commerce with foreign countries, or among the several States, and the exercise by a State of what are called police powers. Although the members of the court did

not fully agree as to the grounds upon which the decision should be placed, they were unanimous in holding that the statutes then under examination were not inconsistent with the Constitution of the United States, or with any act of Congress. Chief Justice Taney said: "If any State deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice, or debauchery, I see nothing in the Constitution of the United States to prevent it from regulating and restraining the traffic, or from prohibiting it altogether, if it thinks proper." (p. 577.) Mr. Justice McLean, among other things, said: "A State regulates its domestic commerce, contracts, the transmission of estates, real and personal, and acts upon all internal matters which relate to its moral and political welfare. Over these subjects the Federal government has no power. . . . The acknowledged police power of a State extends often to the destruction of property. A nuisance may be abated. Everything prejudicial to the health or morals of a city may be removed." (pp. 588, 589.) Mr. Justice Woodbury observed: "How can they [the States] be sovereign within their respective spheres, without power to regulate all their internal commerce, as well as police, and direct how, when, and where it shall be conducted in articles intimately connected either with public morals, or public safety, or the public prosperity?" (p. 628.) Mr. Justice Grier, in still more emphatic language, said: "The true question presented by these cases, and one which I am not disposed to evade, is whether the States have a right to prohibit the sale and consumption of an article of commerce which they believe to be pernicious in its effects, and the cause of disease, pauperism, and crime. . . . Without attempting to define what are the peculiar subjects or limits of this power, it may safely be affirmed, that every law for the restraint and punishment of crime, for the preservation of the public peace, health, and morals must come within this category. . . . It is not necessary, for the sake of justifying the state legislation now under consideration, to array the appalling statistics of misery, pauperism, and crime, which have their origin in the use or abuse of ardent spirits. The

police power, which is exclusively in the States, is alone competent to the correction of these great evils, and all measures of restraint or prohibition necessary to effect the purpose are within the scope of that authority." (pp. 631, 632.)

In *Bartemeyer* v. *Iowa,* 18 Wall. 129, it was said that prior to the adoption of the Fourteenth Amendment, state enactments, regulating or prohibiting the traffic in intoxicating liquors, raised no question under the Constitution of the United States; and that such legislation was left to the discretion of the respective States, subject to no other limitations than those imposed by their own constitutions, or by the general principles supposed to limit all legislative power. Referring to the contention that the right to sell intoxicating liquors was secured by the Fourteenth Amendment, the court said that "so far as such a right exists, it is not one of the rights growing out of citizenship of the United States." In *Beer Co.* v. *Massachusetts,* 97 U. S. 25, 33, it was said, that, "as a measure of police regulation, looking to the preservation of public morals, a state law prohibiting the manufacture and sale of intoxicating liquors is not repugnant to any clause of the Constitution of the United States." Finally, in *Foster* v. *Kansas,* 112 U. S. 201, 206, the court said that the question as to the constitutional power of a State to prohibit the manufacture and sale of intoxicating liquors was no longer an open one in this court. These cases rest upon the acknowledged right of the States of the Union to control their purely internal affairs, and, in so doing, to protect the health, morals, and safety of their people by regulations that do not interfere with the execution of the powers of the general government, or violate rights secured by the Constitution of the United States. The power to establish such regulations, as was said in *Gibbons* v. *Ogden,* 9 Wheat. 1, 203, reaches everything within the territory of a State not surrendered to the national government.

It is, however, contended, that, although the State may prohibit the manufacture of intoxicating liquors for sale or barter within her limits, for general use as a beverage, "no convention or legislature has the right, under our form of govern-

ment, to prohibit any citizen from manufacturing for his own use, or for export, or storage, any article of food or drink not endangering or affecting the rights of others." The argument made in support of the first branch of this proposition, briefly stated, is, that in the implied compact between the State and the citizen certain rights are reserved by the latter, which are guaranteed by the constitutional provision protecting persons against being deprived of life, liberty, or property, without due process of law, and with which the State cannot interfere; that among those rights is that of manufacturing for one's use either food or drink; and that while, according to the doctrines of the Commune, the State may control the tastes, appetites, habits, dress, food, and drink of the people, our system of government, based upon the individuality and intelligence of the citizen, does not claim to control him, except as to his conduct to others, leaving him the sole judge as to all that only affects himself.

It will be observed that the proposition, and the argument made in support of it, equally concede that the right to manufacture drink for one's personal use is subject to the condition that such manufacture does not endanger or affect the rights of others. If such manufacture does prejudicially affect the rights and interests of the community, it follows, from the very premises stated, that society has the power to protect itself, by legislation, against the injurious consequences of that business. As was said in *Munn* v. *Illinois*, 94 U. S. 113, 124, while power does not exist with the whole people to control rights that are purely and exclusively private, government may require "each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another."

But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink, either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they

please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety.

It does not at all follow that every statute enacted ostensibly for the promotion of these ends, is to be accepted as a legitimate exertion of the police powers of the State. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute, *Sinking Fund Cases*, 99 U. S. 700, 718, the courts must obey the Constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. "To what purpose," it was said in *Marbury* v. *Madison*, 1 Cranch, 137, 176, "are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation." The courts are not bound by mere forms, nor are they to be misled by mere pretences. They are at liberty — indeed, are under a solemn duty — to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

Keeping in view these principles, as governing the relations of the judicial and legislative departments of government with each other, it is difficult to perceive any ground for the judiciary to declare that the prohibition by Kansas of the

manufacture or sale, within her limits, of intoxicating liquors for general use there as a beverage, is not fairly adapted to the end of protecting the community against the evils which confessedly result from the excessive use of ardent spirits. There is no justification for holding that the State, under the guise merely of police regulations, is here aiming to deprive the citizen of his constitutional rights; for we cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety, may be endangered by the general use of intoxicating drinks; nor the fact, established by statistics accessible to every one, that the idleness, disorder, pauperism, and crime existing in the country are, in some degree at least, traceable to this evil. If, therefore, a state deems the absolute prohibition of the manufacture and sale, within her limits, of intoxicating liquors for other than medical, scientific, and manufacturing purposes, to be necessary to the peace and security of society, the courts cannot, without usurping legislative functions, override the will of the people as thus expressed by their chosen representatives. They have nothing to do with the mere policy of legislation. Indeed, it is a fundamental principle in our institutions, indispensable to the preservation of public liberty, that one of the separate departments of government shall not usurp powers committed by the Constitution to another department. And so, if, in the judgment of the legislature, the manufacture of intoxicating liquors for the maker's own use, as a beverage, would tend to cripple, if it did not defeat, the effort to guard the community against the evils attending the excessive use of such liquors, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question. So far from such a regulation having no relation to the general end sought to be accomplished, the entire scheme of prohibition, as embodied in the constitution and laws of Kansas, might fail, if the right of each citizen to manufacture intoxicating liquors for his own use as a beverage were recognized. Such a right does not inhere in citizenship. Nor can it be said that government interferes with or impairs

any one's constitutional rights of liberty or of property, when it determines that the manufacture and sale of intoxicating drinks, for general or individual use, as a beverage, are, or may become, hurtful to society, and constitute, therefore, a business in which no one may lawfully engage. Those rights are best secured, in our government, by the observance, upon the part of all, of such regulations as are established by competent authority to promote the common good. No one may rightfully do that which the law-making power, upon reasonable grounds, declares to be prejudicial to the general welfare.

This conclusion is unavoidable, unless the Fourteenth Amendment of the Constitution takes from the States of the Union those powers of police that were reserved at the time the original Constitution was adopted. But this court has declared, upon full consideration, in *Barbier* v. *Connolly*, 113 U. S. 27, 31, that the Fourteenth Amendment had no such effect. After observing, among other things, that that Amendment forbade the arbitrary deprivation of life or liberty, and the arbitrary spoliation of property, and secured equal protection to all under like circumstances, in respect as well to their personal and civil rights as to their acquisition and enjoyment of property, the court said: "But neither the Amendment — broad and comprehensive as it is — nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity."

Undoubtedly the State, when providing, by legislation, for the protection of the public health, the public morals, or the public safety, is subject to the paramount authority of the Constitution of the United States, and may not violate rights secured or guaranteed by that instrument, or interfere with the execution of the powers confided to the general government. *Henderson* v. *Mayor of New York*, 92 U. S. 259; *Railroad Co.* v. *Husen*, 95 U. S. 465; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650; *Walling* v. *Michigan*,

116 U. S. 446; *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Morgan's Steamship Co.* v. *Louisiana. Board of Health*, 118 U. S. 455.

Upon this ground — if we do not misapprehend the position of defendants — it is contended that, as the primary and principal use of beer is as a beverage; as their respective breweries were erected when it was lawful to engage in the manufacture of beer for every purpose; as such establishments will become of no value as property, or, at least, will be materially diminished in value, if not employed in the manufacture of beer for every purpose; the prohibition upon their being so employed is, in effect, a taking of property for public use without compensation, and depriving the citizen of his property without due process of law. In other words, although the State, in the exercise of her police powers, may lawfully prohibit the manufacture and sale, within her limits, of intoxicating liquors to be used as a beverage, legislation having that object in view cannot be enforced against those who, at the time, happen to own property, the chief value of which consists in its fitness for such manufacturing purposes, unless compensation is first made for the diminution in the value of their property, resulting from such prohibitory enactments.

This interpretation of the Fourteenth Amendment is inadmissible. It cannot be supposed that the States intended, by adopting that Amendment, to impose restraints upon the exercise of their powers for the protection of the safety, health, or morals of the community. In respect to contracts, the obligations of which are protected against hostile state legislation, this court in *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746, 751, said that the State could not, by any contract, limit the exercise of her power to the prejudice of the public health and the public morals. So, in *Stone* v. *Mississippi*, 101 U. S. 814, 816, where the Constitution was invoked against the repeal by the State of a charter, granted to a private corporation, to conduct a lottery, and for which that corporation paid to the State a valuable consideration in money, the court said: "No legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants. . . . Government is organized

with a view to their preservation, and cannot divest itself of the power to provide for them." Again, in *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 672: "The consti-tutional prohibition upon state laws impairing the obligation or contracts does not restrict the power of the State to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts. Rights and privileges arising from contracts with a State are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense, and to the same extent, as are all contracts and all property, whether owned by natural persons or corporations."

The principle, that no person shall be deprived of life, lib-erty, or property, without due process of law, was embodied, in substance, in the constitutions of nearly all, if not all, of the States at the time of the adoption of the Fourteenth Amend-ment; and it has never been regarded as incompatible with the principle, equally vital, because essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community. *Beer Co.* v. *Massachusetts*, 97 U. S. 25, 32; *Commonwealth* v. *Alger*, 7 Cush. 53. An illustration of this doctrine is afforded by *Patterson* v. *Ken-tucky*, 97 U. S. 501. The question there was as to the validity of a statute of Kentucky, enacted in 1874, imposing a penalty upon any one selling or offering for sale oils and fluids, the product of coal, petroleum, or other bituminous substances, which would burn or ignite at a temperature below 130° Fahrenheit. Patterson having sold, within that common-wealth, a certain oil, for which letters-patent were issued in 1867, but which did not come up to the standard required by said statute, and having been indicted therefor, disputed the State's authority to prevent or obstruct the exercise of that right. This court upheld the legislation of Kentucky, upon the ground, that while the State could not impair the exclu-sive right of the patentee, or of his assignee, in the discovery described in the letters-patent, the tangible property, the fruit of the discovery, was not beyond control in the exercise of her

police powers. It was said: "By the settled doctrines of this court the police power extends, at least, to the protection of the lives, the health, and the property of the community against the injurious exercise by any citizen of his own rights. State legislation, strictly and legitimately for police purposes, does not, in the sense of the Constitution, necessarily intrench upon any authority which has been confided, expressly or by implication, to the national government. The Kentucky statute under examination manifestly belongs to that class of legislation. It is, in the best sense, a mere police regulation, deemed essential to the protection of the lives and property of citizens." p. 504. Referring to the numerous decisions of this court guarding the power of Congress to regulate commerce against encroachment, under the guise of state regulations, established for the purpose and with the effect of destroying or impairing rights secured by the Constitution, it was further said: "It has, nevertheless, with marked distinctness and uniformity, recognized the necessity, growing out of the fundamental conditions of civil society, of upholding state police regulations which were enacted in good faith, and had appropriate and direct connection with that protection to life, health, and property which each State owes to her citizens." See also *United States* v. *Dewitt*, 9 Wall. 41; *License Tax Cases*, 5 Wall. 462; *Pervear* v. *Commonwealth*, 5 Wall. 475.

Another decision, very much in point upon this branch of the case, is *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 667, also decided after the adoption of the Fourteenth Amendment. The court there sustained the validity of an ordinance of the village of Hyde Park, in Cook County, Illinois, passed under legislative authority, forbidding any person from transporting through that village offal or other offensive or unwholesome matter, or from maintaining or carrying on an offensive or unwholesome business or establishment within its limits. The Fertilizing Company had, at large expense, and under authority expressly conferred by its charter, located its works at a particular point in the county. Besides, the charter of the village, at that time, provided that it should not interfere with parties engaged in transporting animal matter from Chicago,

or from manufacturing it into a fertilizer or other chemical product. The enforcement of the ordinance in question operated to destroy the business of the company, and seriously to impair the value of its property. As, however, its business had become a nuisance to the community in which it was conducted, producing discomfort, and often sickness, among large masses of people, the court maintained the authority of the village, acting under legislative sanction, to protect the public health against such nuisance. It said: "We cannot doubt that the police power of the State was applicable and adequate to give an effectual remedy. That power belonged to the States when the Federal Constitution was adopted. They did not surrender it, and they all have it now. It extends to the entire property and business within their local jurisdiction. Both are subject to it in all proper cases. It rests upon the fundamental principle that every one shall so use his own as not to wrong and injure another. To regulate and abate nuisances is one of its ordinary functions."

It is supposed by the defendants that the doctrine for which they contend is sustained by *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166. But in that view we do not concur. That was an action for the recovery of damages for the overflowing of the plaintiff's land by water, resulting from the construction of a dam across a river. The defence was that the dam constituted a part of the system adopted by the State for improving the navigation of Fox and Wisconsin rivers; and it was contended that as the damages of which the plaintiff complained were only the result of the improvement, under legislative sanction, of a navigable stream, he was not entitled to compensation from the State or its agents. The case, therefore, involved the question whether the overflowing of the plaintiff's land, to such an extent that it became practically unfit to be used, was a taking of property, within the meaning of the constitution of Wisconsin, providing that "the property of no person shall be taken for public use without just compensation therefor." This court said it would be a very curious and unsatisfactory result, were it held that, "if the government refrains from the absolute conversion of real

property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction, without making any compensation, because, in the narrowest sense of that word, it is not *taken* for the public use.   Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for the invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors."   pp. 177, 178.

These principles have no application to the case under consideration.    The question in *Pumpelly* v. *Green Bay Company* arose under the State's power of eminent domain ; while the question now before us arises under what are, strictly, the police powers of the State, exerted for the protection of the health, morals, and safety of the people.    That case, as this court said in *Transportation Co.* v. *Chicago*, 99 U. S. 635, 642, was an extreme qualification of the doctrine, universally held, that " acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though these consequences may impair its use," do not constitute a taking within the meaning of the constitutional provision, or entitle the owner of such property to compensation from the State or its agents, or give him any right of action.    It was a case in which there was a " permanent flooding of private property," a " physical invasion of the real estate of the private owner, and a practical ouster of his possession."    His property was, in effect, required to be devoted to the use of the public, and, consequently, he was entitled to compensation.

As already stated, the present case must be governed by principles that do not involve the power of eminent domain, in the exercise of which property may not be taken for public use without compensation.   A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or

an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the State that its use by any one, for certain forbidden purposes, is prejudicial to the public interests. Nor can legislation of that character come within the Fourteenth Amendment, in any case, unless it is apparent that its real object is not to protect the community, or to promote the general well-being, but, under the guise of police regulation, to deprive the owner of his liberty and property, without due process of law. The power which the States have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not — and, consistently with the existence and safety of organized society, cannot be — burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner.

It is true, that, when the defendants in these cases purchased or erected their breweries, the laws of the State did not forbid the manufacture of intoxicating liquors. But the State did not thereby give any assurance, or come under an obligation, that its legislation upon that subject would remain unchanged. Indeed, as was said in *Stone* v. *Mississippi*, above cited, the supervision of the public health and the public morals is a governmental power, "continuing in its nature," and "to be dealt with as the special exigencies of the moment may require;" and that, "for this purpose, the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself." So in *Beer Co.* v. *Massachu-*

*setts*, 97 U. S. 32: "If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance by any incidental inconvenience which individuals or corporations may suffer."

It now remains to consider certain questions relating particularly to the thirteenth section of the act of 1885. That section — which takes the place of § 13 of the act of 1881 — is as follows:

"SEC. 13. All places where intoxicating liquors are manufactured, sold, bartered, or given away in violation of any of the provisions of this act, or where intoxicating liquors are kept for sale, barter, or delivery in violation of this act, are hereby declared to be common nuisances; and upon the judgment of any court having jurisdiction finding such place to be a nuisance under this section, the sheriff, his deputy, or under sheriff, or any constable of the proper county, or marshal of any city where the same is located, shall be directed to shut up and abate such place by taking possession thereof and destroying all intoxicating liquors found therein, together with all signs, screens, bars, bottles, glasses, and other property used in keeping and maintaining said nuisance; and the owner or keeper thereof shall, upon conviction, be adjudged guilty of maintaining a common nuisance, and shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, and by imprisonment in the county jail not less than thirty days nor more than ninety days. The attorney general, county attorney, or any citizen of the county where such nuisance exists, or is kept, or is maintained, may maintain an action in the name of the State to abate and perpetually enjoin the same. The injunction shall be granted at the commencement of the action, and no bond shall be required. Any person violating the terms of any injunction granted in such proceeding, shall be punished as for contempt, by a fine of not less than one hundred nor more than five hundred dollars, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment, in the discretion of the court."

It is contended by counsel in the case of *Kansas* v. *Ziebold & Hagelin*, that the entire scheme of this section is an attempt to deprive persons who come within its provisions of their property and of their liberty without due process of law; especially, when taken in connection with that clause of § 14 (amendatory of § 21 of the act of 1881) which provides that "in prosecutions under this act, by indictment or otherwise, . . . it shall not be necessary in the first instance for the State to prove that the party charged did not have a permit to sell intoxicating liquors for the excepted purposes."

We are unable to perceive anything in these regulations inconsistent with the constitutional guarantees of liberty and property. The State having authority to prohibit the manufacture and sale of intoxicating liquors for other than medical, scientific, and mechanical purposes, we do not doubt her power to declare that any place, kept and maintained for the illegal manufacture and sale of such liquors, shall be deemed a common nuisance, and be abated, and, at the same time, to provide for the indictment and trial of the offender. One is a proceeding against the property used for forbidden purposes, while the other is for the punishment of the offender.

It is said that by the thirteenth section of the act of 1885, the legislature, finding a brewery within the State in actual operation, without notice, trial, or hearing, by the mere exercise of its arbitrary caprice, declares it to be a common nuisance, and then prescribes the consequences which are to follow inevitably by judicial mandate required by the statute, and involving and permitting the exercise of no judicial discretion or judgment; that the brewery being found in operation, the court is not to *determine* whether it is a common nuisance, but, under the command of the statute, is to *find it* to be one; that it is not the liquor made, or the making of it, which is thus enacted to be a common nuisance, but the place itself, including all the property used in keeping and maintaining the common nuisance; that the judge having thus signed without inquiry — and, it may be, contrary to the fact and against his own judgment — the edict of the legislature, the court is commanded to take possession by its officers of the

place and shut it up; nor is all this destruction of property, by legislative edict, to be made as a forfeiture consequent upon conviction of any offence, but merely because the legislature so commands; and it is done by a *court of equity*, without any previous conviction first had, or any trial known to the law.

This, certainly, is a formidable arraignment of the legislation of Kansas, and if it were founded upon a just interpretation of her statutes, the court would have no difficulty in declaring that they could not be enforced without infringing the constitutional rights of the citizen. But those statutes have no such scope and are attended with no such results as the defendants suppose. The court is not required to give effect to a legislative "decree" or "edict," unless every enactment by the law-making power of a State is to be so characterized. It is not declared that every establishment is to be deemed a common nuisance because it may have been maintained prior to the passage of the statute as a place for manufacturing intoxicating liquors. The statute is prospective in its operation, that is, it does not put the brand of a common nuisance upon any place, unless, after its passage, that place is kept and maintained for purposes declared by the legislature to be injurious to the community. Nor is the court required to adjudge any place to be a common nuisance simply because it is charged by the State to be such. It must first find it to be of that character; that is, must ascertain, in some legal mode, whether since the statute was passed the place in question has been, or is being, so used, as to make it a common nuisance.

Equally untenable is the proposition that proceedings in equity for the purposes indicated in the thirteenth section of the statute are inconsistent with due process of law. "In regard to public nuisances," Mr. Justice Story says, "the jurisdiction of courts of equity seems to be of a very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. The jurisdiction is applicable not only to public nuisances, strictly so called, but also to purprestures upon public rights and property. . . . In case of public nuisances, properly so called, an indictment lies to abate them, and to punish the

offenders. But an information, also, lies in equity to redress the grievance by way of injunction." 2 Story's Eq. §§ 921, 922. The ground of this jurisdiction in cases of purpresture, as well as of public nuisances, is the ability of courts of equity to give a more speedy, effectual, and permanent remedy, than can be had at law. They can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals, or safety of the community. Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury. *District Attorney* v. *Lynn and Boston Railroad Co.*, 16 Gray, 242, 245; *Attorney General* v. *New Jersey Railroad*, 2 Green, Ch. 139; *Attorney General* v. *Tudor Ice Co.*, 104 Mass. 239, 244; *State* v. *Mayor*, 5 Porter (Ala.), 279, 294; *Hoole* v. *Attorney General*, 22 Ala. 190, 194; *Attorney General* v. *Hunter*, 1 Dev. Eq. 12; *Attorney General* v. *Forbes*, 2 Myl. & Cr. 123, 129, 133; *Attorney General* v. *Great Northern Railway Co.*, 1 Drew. & Sm. 154, 161; Eden on Injunctions, 259; Kerr on Injunctions (2d ed.), 168.

As to the objection that the statute makes no provision for a jury trial in cases like this one, it is sufficient to say that such a mode of trial is not required in suits in equity brought to abate a public nuisance. The statutory direction that an injunction issue at the commencement of the action is not to be construed as dispensing with such preliminary proof as is necessary to authorize an injunction pending the suit. The court is not to issue an injunction simply because one is asked, or because the charge is made that a common nuisance is maintained in violation of law. The statute leaves the court at liberty to give effect to the principle that an injunction will not be granted to restrain a nuisance, except upon clear and satisfactory evidence that one exists. Here the fact to be ascertained was, not whether a place, kept and maintained for

purposes forbidden by the statute, was, *per se*, a nuisance — that fact being conclusively determined by the statute itself — but whether the place in question was so kept and maintained.

If the proof upon that point is not full or sufficient, the court can refuse an injunction, or postpone action until the State first obtains the verdict of a jury in her favor. In this case, it cannot be denied that the defendants kept and maintained a place that is within the statutory definition of a common nuisance. Their petition for the removal of the cause from the state court, and their answer to the bill, admitted every fact necessary to maintain this suit, if the statute, under which it was brought, was constitutional.

Touching the provision that in prosecutions, by indictment or otherwise, the State need not, in the first instance, prove that the defendant has not the permit required by the statute, we may remark that, if it has any application to a proceeding like this, it does not deprive him of the presumption that he is innocent of any violation of law. It is only a declaration that when the State has proven that the place described is kept and maintained for the manufacture or sale of intoxicating liquors — such manufacture or sale being unlawful except for specified purposes, and then only under a permit — the prosecution need not prove a negative, namely, that the defendant has not the required license or permit. If the defendant has such license or permit, he can easily produce it, and thus overthrow the *prima facie* case established by the State.

A portion of the argument in behalf of the defendants is to the effect that the statutes of Kansas forbid the manufacture of intoxicating liquors to be exported, or to be carried to other States, and, upon that ground, are repugnant to the clause of the Constitution of the United States, giving Congress power to regulate commerce with foreign nations and among the several States. We need only say, upon this point, that there is no intimation in the record that the beer which the respective defendants manufactured was intended to be carried out of the State or to foreign countries. And, without expressing an opinion as to whether such facts would have constituted a good defence, we observe that it will be time enough to decide a case of that character when it shall come before us.

*For the reasons stated, we are of opinion that the judgments of the Supreme Court of Kansas have not denied to Mugler, the plaintiff in error, any right, privilege, or immunity secured to him by the Constitution of the United States, and its judgment, in each case, is, accordingly, affirmed. We are, also, of opinion that the Circuit Court of the United States erred in dismissing the bill of the State against Ziebold & Hagelin. The decree in that case is reversed, and the cause remanded, with directions to enter a decree granting to the State such relief as the act of March 7, 1885, authorizes.*

MR. JUSTICE FIELD delivered the following separate opinion.

I dissent from the judgment in the last case, the one coming from the Circuit Court of the United States.

I agree to so much of the opinion as asserts that there is nothing in the Constitution or laws of the United States affecting the validity of any act of Kansas prohibiting the sale of intoxicating liquors manufactured in the State, except under proper regulations for the protection of the health and morals of the people. But I am not prepared to say that the State can prohibit the manufacture of such liquors within its limits if they are intended for exportation, or forbid their sale within its limits, under like regulations, if Congress has authorized their importation, though the act of Kansas is broad enough to include both such manufacture and sale. The right to import an article of merchandise, recognized as such by the commercial world — whether the right be given by act of Congress or by treaty with a foreign country — would seem necessarily to carry the right to sell the article when imported. In *Brown* v. *Maryland*, 12 Wheat. 447, Chief Justice Marshall, in delivering the opinion of this court, said as follows: "Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing,

then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell."

If one State can forbid the sale within its limits of an imported article, so may all the States, each selecting a different article. There would then be little uniformity of regulations with respect to articles of foreign commerce imported into different States, and the same may be also said of regulations with respect to articles of interstate commerce. And we know it was one of the objects of the formation of the Federal Constitution to secure uniformity of commercial regulations against discriminating state legislation. The construction of the commercial clause of the Constitution, upon which the License cases in the 7th of Howard were decided, appears to me to have been substantially abandoned in later decisions. *Hall* v. *De Cuir*, 95 U. S. 485; *Welton* v. *State of Missouri*, 91 U. S. 275; *County of Mobile* v. *Kimball*, 102 U. S. 691; *Transportation Co.* v. *Parkersburgh*, 107 U. S. 691; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196; *Wabash, St. Louis & Pacific Railway Co.* v. *Illinois*, 118 U. S. 557. I make this reservation that I may not hereafter be deemed concluded by a general concurrence in the opinion of the majority.

I do not agree to what is said with reference to the case from the United States Circuit Court. That was a suit in equity brought for the abatement of the brewery owned by the defendants. It is based upon clauses in the thirteenth section of the act of Kansas, which are as follows:

" All places where intoxicating liquors are manufactured, sold, bartered, or given away in violation of any of the provisions of this act, or where intoxicating liquors are kept for sale, barter, or delivery in violation of this act, *are hereby declared to be common nuisances ;* and upon the judgment of any court having jurisdiction finding such place to be a nuisance under this section, the sheriff, his deputy, or under sheriff, or any constable of the proper county, or marshal of any city where the same is located, shall be directed to shut

up and abate such place by taking possession thereof and destroying all intoxicating liquors found therein, together with all signs, screens, bars, bottles, glasses, and other property used in keeping and maintaining said nuisance; and the owner or keeper thereof shall, upon conviction, be adjudged guilty of maintaining a common nuisance, and shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, and by imprisonment in the county jail not less than thirty days nor more than ninety days. The Attorney General, county attorney, or any citizen of the county where such nuisance exists, or is kept, or is maintained, may maintain an action in the name of the State to abate and perpetually enjoin the same. The injunction shall be granted at the commencement of the action, and no bond shall be required."

By a previous section all malt, vinous, and fermented liquors are classed as intoxicating liquors, and their manufacture, barter, and sale are equally prohibited. By the thirteenth section, as is well said by counsel, the legislature, without notice to the owner or hearing of any kind, declares every place where such liquors are sold, bartered, or given away, or kept for sale, barter, or delivery — in this case a brewery, where beer was manufactured and sold, which, up to the passage of the act, was a lawful industry — to be a common nuisance; and then prescribes what shall follow, upon a court having jurisdiction finding one of such places to be what the legislature has already pronounced it. The court is not to determine whether the place is a common nuisance in fact, but is to find it to be so if it comes within the definition of the statute, and, having thus found it, the executive officers of the court are to be directed to shut up and abate the place by taking possession of it; and, as though this were not sufficient security against the continuance of the business, they are to be required to destroy all the liquor found therein, and all other property used in keeping and maintaining the nuisance. It matters not whether they are of such a character as could be used in any other business, or be of value for any other purposes. No discretion is left in the judge or in the officer.

These clauses appear to me to deprive one who owns a brewery and manufactures beer for sale, like the defendants, of property without due process of law.   The destruction to be ordered is not as a forfeiture upon conviction of any offence, but merely because the legislature has so commanded.   Assuming, which is not conceded, that the legislature, in the exercise of that undefined power of the State, called its police power, may, without compensation to the owner, deprive him of the use of his brewery for the purposes for which it was constructed under the sanction of the law, and for which alone it is valuable, I cannot see upon what principle, after closing the brewery, and thus putting an end to its use in the future for manufacturing spirits, it can order the destruction of the liquor already manufactured, which it admits by its legislation may be valuable for some purposes, and allows to be sold for those purposes.   Nor can I see how the protection of the health and morals of the people of the State can require the destruction of property like bottles, glasses, and other utensils, which may be used for many lawful purposes.   It has heretofore been supposed to be an established principle, that where there is a power to abate a nuisance, the abatement must be limited by its necessity, and no wanton or unnecessary injury can be committed to the property or rights of individuals. Thus, if the nuisance consists in the use to which a building is put, the remedy is to stop such use, not to tear down or to demolish the building itself, or to destroy property found within it.   *Babcock* v. *City of Buffalo*, 56 N. Y. 268; *Chenango Bridge Co.* v. *Paige*, 83 N. Y. 178, 189.   The decision of the court, as it seems to me, reverses this principle.

It is plain that great wrong will often be done to manufacturers of liquors, if legislation like that embodied in this thirteenth section can be upheld.   The Supreme Court of Kansas admits that the legislature of the State, in destroying the values of such kinds of property, may have gone to the utmost verge of constitutional authority.   In my opinion it has passed beyond that verge, and crossed the line which separates regulation from confiscation.