EMILIO M. GARZA, Circuit Judge,
concurring specially:
For the second time in my judicial career, I am forced to follow a Supreme Court opinion I believe to be inimical to the Constitution. See Sojourner T. v. Edwards, 974 F.2d 27, 31 (5th Cir.1992) (Garza, J., concurring specially). Although I have misgivings about whether the Act’s failure to require expedient decision can support a facial challenge under United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987), I generally agree with the majority’s opinion that certain provisions of Act 1254 are unconstitutional according to the Supreme Court’s opinion in Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) {Bellotti II). I respectfully disagree with the Bellotti II Court that the Constitution requires the result we reach today. I do not believe that the language of the Fourteenth Amendment speaks to the discretion judges may exercise in permitting minors to have an abortion. I think that the Bellotti II opinion crossed the line from judicial review to judicial legislation. Furthermore, in the absence of governing constitutional text, I believe that ontological issues such as abortion are more properly decided in the political and legislative arenas. Mindful, however, that the Constitution invests the Supreme Court with the final say, I defer to the Court’s authority and concur in the majority opinion.
I
My disagreement with the holding of Bellotti II begins generally with substantive due process. Although the Supreme Court has assumed that the Fourteenth Amendment has a substantive component, see Planned Parenthood v. Casey, 505 U.S. 833, 846, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992) (Due Process Clause “has been understood to contain a substantive component”), it has found the boundaries of such substantive rights to be elusive. Nonetheless, courts have extended such protections quite far, as evidenced by the Bellotti II opinion, which establishes ambitious and very specific minimum requirements for parental consent statutes in the abortion context.
A
The constitutional mandate of Bellotti II springs from a single word used by the drafters of the Civil War amendments: liberty. Casey, 505 U.S. at 846, 112 S.Ct. at 2804. The relevant portion of the Fourteenth Amendment provides that “[n]o state shall ... deprive any person of life, liberty, or property, without due process of law....” U.S. Const, amend. XIV. Drafted in the wake of the Civil War, this clause stands as a guarantee against arbitrary action against people by state governments. Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986).
“Substantive” due process, as the argument goes, is implicit in this notion. Proponents suggest (or assume) that some government action departs so far from the constitutional scheme that no amount of process will be sufficient to ratify its legitimacy. See, e.g., Casey, 505 U.S. at 846, 112 S.Ct. at 2804; Daniels, 474 U.S. at 331, 106 S.Ct. at 665. The Court has “understood” the Fourteenth Amendment to include such guarantees at least as far back as 1887, see Casey, 505 U.S. at 846, 112 S.Ct. at 2804 (citing Mugler v. Kansas, 123 U.S. 623, 660-61, 8 S.Ct. 273, 291, 31 L.Ed. 205 (1887)) (holding that the Fourteenth Amendment protected brewer from arbitrary deprivation of property), although the Court has probably understood the notion of due process to include a substantive component at least as early as Dred Scott v. Sanford, 60 U.S. (How.) 393, 450, 15 L.Ed. 691 (1856) (interpreting the Fifth Amendment to say that “an act of Congress which deprives a citizen of the United States of his liberty or property, merely because he came himself or brought his property into a particular Territory of the United States, and who had committed no offence against the laws, could hardly be *1114 dignified with the name of due process of law”).
Employing this theory of substantive guarantees, the Supreme Court has read the word “liberty” to create extensive, “fundamental” rights that the state may burden only under the most compelling of circumstances and only in the narrowest of ways. The Court has used the Fourteenth Amendment to constitutionalize such issues as contraception, Carey v. Population Services Int’l 431 U.S. 678, 684-85, 97 S.Ct. 2010, 2015-16, 52 L.Ed.2d 675 (1977); Griswold v. Connecticut, 381 U.S. 479, 483-86, 85 S.Ct. 1678, 1681-82, 14 L.Ed.2d 510 (1965); municipal housing regulations, Moore v. East Cleveland, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion); child rearing, Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); marriage, Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); school curricula, Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); and, of course, abortion, Roe v. Wade 410 U.S. 113, 152-53, 93 S.Ct. 705, 726-27, 35 L.Ed.2d 147 (1973). This list is only a partial catalogue of issues, not mentioned anywhere in the Constitution generally or the Fourteenth Amendment specifically, that the Supreme Court has removed from the political arena. The Court’s good intentions, expressed in these cases, have slowly eroded the scope of public debate.
I do not believe that we should narrow the scope of procedural protection afforded by the Fifth or Fourteenth Amendments.- Nor do I dispute that the Fourteenth Amendment incorporates most of the Bill of Rights. See, e.g., Casey, 505 U.S. at 847, 112 S.Ct. at 2804; Duncan v. Louisiana, 391 U.S. 145, 147-148, 88 S.Ct. 1444, 1446, 20 L.Ed.2d 491 (1968). However, I think it is a mistake to create new substantive rights, of whole cloth, for every state and for all time, under implicit “penumbras” of a written Constitution; see, e.g., Griswold v. Connecticut, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965) (“[S]pecific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance.”); through constitutional extrapolation, see id. at 484, 85 S.Ct. at 1682 (holding that contraception, although not mentioned in the Bill of Rights, “concerns a relationship lying within the zone of privacy created by several fundamental constitutional guarantees”); or by mere assumptions, see Casey, 505 U.S. at 982, 112 S.Ct. at 2875 (Scalia, J., dissenting in part) (“ ‘[Reasoned judgment’ does not begin by begging the question, as Roe and subsequent cases unquestionably did by assuming that what the State is protecting is the mere ‘potentiality of human life.’ ”).
Perhaps many of the most important substantive due process cases could have been decided under other constitutional provisions, such as the First Amendment. See, e.g., Meyer v. Nebraska, 262 U.S. 390, 399-403, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923) (striking down statute that forbade teaching of German in grammar school). Alternatively, some of these issues could have been dealt with by the states — if no extant constitutional provision stood in conflict with these laws, the Court need not have stretched the Fourteenth Amendment to create conflict. State legislatures could have changed laws as public attitudes changed. See, e.g., Conn. Gen. Stat. § 53-32 (1969) (repealing Connecticut laws at issue in Griswold prohibiting use of contraceptives). It is a feature of a healthy democracy that evolving public norms find voice in new laws supported by the people.
Some of these judicial decisions, such as invalidating statutes that discriminate based on race, reflect our nation’s highest aspirations as an individualist, pluralist society. Nonetheless, judicial officers should not force the pace of change nor bind the nation to wise policy using loose interpretations of our written Constitution. Neither our aspirations about privacy, nor our concerns about the consequences of leaving certain matters for states to decide, invests us with the authority to nullify state law. Article III courts should not cloak political choices with claims that those choices are required by the Due Process Clause. See Casey, 505 U.S. at 983, 112 S.Ct. at 2875 (Scalia, J., dissenting in part).
*1115 Currently, the boundaries of substantive due process are less than pellucid. As these unenumerated substantive rights are by their natures not explicit, the Court has understandably had difficulty in fixing their outer perimeter. We have been told by the Court that the limits of due process cannot be reduced to a formula, Poe v. Ullman, 367 U.S. 497, 542, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting), and that the doctrine’s “boundaries are not susceptible of expression as a simple rule.” Casey, 505 U.S. at 849, 112 S.Ct. at 2806. The Court has suggested that substantive rights must be so “implicit in the concept of ordered liberty,” that “neither liberty nor justice would exist if [they were] sacrificed,” Palko v. Connecticut, 302 U.S. 319, 325, 326, 58 S.Ct. 149, 151, 152, 82 L.Ed. 288 (1937). It has also said that “at the heart of liberty is the right to define one’s own concept of existence, of meaning, of the universe, and of the mystery of human life.” Casey, 505 U.S. at 851, 112 S.Ct. at 2807. As illustrated by the catalogue of substantive due process rights discussed earlier, the Fourteenth Amendment (thus interpreted) puts quite a bit of public policy within the “heart” of liberty. This is how the Supreme Court has dealt with the admittedly difficult issue of circumscribing which rights and liberties the Fourteenth Amendment comprises.
I do not believe that such open-ended inquiry can be helpful to judges interpreting the Fourteenth Amendment. We must return to those principles embedded in the Constitution. First, as Chief Justice Marshall said in Marbury v. Madison, “it is emphatically the province and duty of the judicial department to say what the law is.” 5 U.S. (Cranch) 137, 177, 2 L.Ed. 60 (1803). Importantly, “to say what the law is” presupposes that there is law to interpret. The Constitution does not charge courts with legislation, merely interpretation.
Second, the powers of legislatures are limited, but not by the inherent power of the courts. They are circumscribed by a written constitution: “The powers of the legislature are defined and limited; and that those limits may not be mistaken and forgotten, the constitution is written.” Id. 5 U.S. at 176 (emphasis added). Indeed, the Framers specifically protected against the combination of legislative and judicial powers in one branch. “The judges can exercise no executive prerogative, though they are shoots from the executive stock; nor any legislative function, though they may be advised by legislative councils.... “Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator.’” The Federalist No. 47, at 303 (James Madison) (Clinton Rossiter ed., 1961) (quoting Charles Montesquieu, The Spirit of Laws, Vol. I, Book IX (1748)).
Third, the people, not the courts, established the Constitution; it is a document of self-determination, not judicial determination. “That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis on which the whole American fabric has been erected.” Marbury, 5 U.S. at 176 (emphasis added). In the context of unenumerated constitutional rights, the Supreme Court has constructed a new constitutional amendment out of the single word “liberty.” Instead of interpreting liberty in the context of the Constitution, the Court would have us interpret the Constitution in the context of its broad interpretation of liberty. Viewed expansively, this word can turn the entire Constitution on its head and nullify any restraints on the Court’s authority, judicial self-restraint notwithstanding, which the Constitution itself rejects.
Fourth and finally, the Constitution is a flexible and dynamic document, designed to have as much vitality today as it did the day it was written. “This provision is made in a constitution, intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs.” M’Culloch v. Maryland, 17 U.S. (Wheat.) 316, 415, 4 L.Ed. 579 (1819). Although historical circumstances change, the principles that undergird the Constitution do not.
With these principles in mind, we should consider the proper way to interpret the Fourteenth Amendment, and accordingly, the proper scope of substantive due process. As *1116 a starting point, an understanding of what constitutional amendments were supposed to mean should guide any attempt to interpret them. The power to amend the Constitution is one of the greatest powers bestowed by the Framers. The power to amend the Constitution gives the people the authority to constrain majorities present and future. Because amendments are so powerful, the Constitution provides a rigorous proposal and ratification procedure for constitutional amendments in Article V, giving special constitutional ratifying authority to the pronouncements of three-fourths of the states. This great authority to bind future generations is seated in the American people. Because only the drafters and the states have the power to amend, their understanding of the words they choose should govern the courts’ interpretations where those words are ambiguous. Courts that stray beyond that meaning are acting beyond their authority. In Casey, however, the courts employed no textual analysis or legislative history, only judicial “understandings.” Casey, 505 U.S. at 846, 112 S.Ct. at 2804.
That is not to say that the Constitution or the Bill of Rights must be frozen in time. As Marshall said in M’Culloch, the Constitution is meant to endure, and its application must be flexible. No one would dispute that the First Amendment protects television or the internet, or that the Fourth Amendment protects cellular phones, even though none of these technologies existed in the late eighteenth century. The understanding of the drafters and ratifiers that Congress should not abridge the freedom of the media must guide the courts’ application of timeless principles to changed circumstances. In this way, the understandings that undergird the Constitution and its amendments continue to have vitality in areas unforeseen at the drafting.
To say that these understandings are flexible, however, is emphatically not to say that changed values gain constitutional precedence to govern changed circumstances. That is a different proposition altogether. It would be unwise to read the Constitution by reference to a telephone poll, see Casey, 505 U.S. at 962, 112 S.Ct. at 2865 (Rehnquist, C.J., dissenting in part); even if it were possible, we have no authority to do so. Article V does not give amendment power to contemporary, majority viewpoints. It explicitly sets forth a procedure to be followed for amendment.
To date, judicial attempts at understanding the meaning of the Fourteenth Amendment have proven unsatisfactory. Although the Court has held that the Due Process Clause incorporates most of the Bill of Rights against the states, Duncan v. Louisiana, 391, U.S. 145, 147-48, 88 S.Ct. 1444, 1446, 20 L.Ed.2d 491 (1968), it has repudiated the notion that the Bill of Rights limits the interpretation of that clause. See Casey, 505 U.S. at 847, 112 S.Ct. at 2804-05 (citing disagreement with Adamson v. California, 332 U.S. 46, 68-92, 67 S.Ct. 1672, 1683-97, 91 L.Ed. 1903 (1947) (Black, J., dissenting)). The Court has also rejected the idea that the drafters of the Due Process Clause only meant to protect citizens from state actions that were unconstitutional under the Due Process Clause of the Fifth Amendment or proscribed by other law when the Fourteenth Amendment was ratified. Id. (citing disagreement with Michael H. v. Gerald D., 491 U.S. 110, 127-28 n. 6, 109 S.Ct. 2333, 2344-45 n. 6, 105 L.Ed.2d 91 (1989)).
In his seminal dissent in Poe v. Ullman (later adopted by the plurality in Casey), Justice Harlan provided a different view of how to interpret the Fourteenth Amendment. Justice Harlan suggested that we consult what “history teaches are the traditions from which [liberty] developed as well as the traditions from which it broke.” Justice Harlan does not suggest that wé look at the history of the Fourteenth Amendment, but rather to American history and traditions generally to determine what liberties have been protected. At first blush, American history might seem to be a good point of reference— a fixed, knowable tradition from which we might draw understanding. There are two major problems with this approach. First, the traditions from which liberty developed may suggest a different role for government than was actually inscribed into the Fourteenth Amendment. Should the liberty of freed slaves under the Fourteenth Amend *1117 ment truly have been defined by reference to American history leading up to the Civil War?
The second major difficulty of Justice Harlan’s approach is that one can find whatever one seeks in history, if one is so determined. It is certainly true that Justice Harlan’s look into American history will produce a richer record from which to draw conclusions. However, to canvas all of American history will likely produce conflicting traditions, allowing those who look to find whatever answers they prefer. See Michael D., 491 U.S. at 137, 109 S.Ct. at 2349 (Brennan, J., dissenting) (Tradition “can be as malleable and as elusive as ‘liberty’ itself____”); Moore v. East Cleveland, 431 U.S. 494, 549, 97 S.Ct. 1932, 1961, 52 L.Ed.2d 531 (1977) (White, J., dissenting) (“What the deeply rooted traditions of the country are is arguable; which of them deserve the protection of the Due Process Clause is even more debatable.”).
The historical approach thus breaks down into the following conundrum: who decides which liberties were recognized in our history? How do we decide which history or tradition is relevant? The task, however, is not to interpret American history, but to interpret the words of the Fourteenth Amendment. The federal judiciary is not composed of historians, merely lawyers whose expertise is neither “history” nor “tradition.” As used in Casey, concepts such as history and tradition have become ersatz constitutional provisions that courts substitute for the actual words.
Understanding the meaning of the word “liberty” in the context of the legislative history of the Fourteenth Amendment avoids many of these judicial struggles to determine who gets to define history. Interpreting the Fourteenth Amendment by reference to the understanding of the drafters and ratifiers is an approach more closely targeted to the task of interpreting a written constitution. In fact, that is what the Supreme Court does in almost interpreting all other provisions of the Constitution.
I realize that sometimes legislative history is less clear than the Amendment or statute it is supposed to illuminate, see, e.g., United States v. Public Utilities Commission, 345
U.S. 295, 320, 73 S.Ct. 706, 720, 97 L.Ed. 1020 (1953) (Jackson, J., concurring), and Congress often speaks with more than one voice as to why it chose particular language in a statute. Compare, e.g., TVA v. Hill, 437 U.S. 153, 173-93, 98 S.Ct. 2279, 2291-2301, 57 L.Ed.2d 117 (1978) (legislative history of Endangered Species Act expresses Congressional intent that Court should enjoin completion of federal dam that would threaten endangered species) with id. at 207-10, 98 S.Ct. at 2308-09 (Powell, J., dissenting) (legislative history of statute supports opposite view) (cited in Stephen Breyer, On the Uses of Legislative History in Interpreting Statutes, 65 S. Cal. L.Rev. 845, 862 n. 39 (1991)). Indeed, some Amendments and statutes have scarce history to consider. Such difficulties, however, are confronted by courts every day. Perfection in legislative history is not to be expected: I do not pretend that this judicial task will be easy, only necessary. Fortunately, because the drafters of the Fourteenth Amendment explained in some detail what they meant to accomplish, the legislative history is particularly usefrd in interpreting the words of the Amendment. See, e.g., Adamson v. California, 332 U.S. 46, 92-123, 67 S.Ct. 1672, 1696-1711, 91 L.Ed. 1903 (1947) (appendix to dissent of Black, J., citing extensive legislative history of Fourteenth .Amendment in Congress).
The drafters of the Fourteenth Amendment certainly had more modest goals in mind by using the term “liberty” than the modem Supreme Court has. Liberty for the drafters came in the context of dealing with restrictive racial laws in the South. In the floor debates surrounding'the drafting of the Fourteenth Amendment, the bill sponsor in the Senate, Senator Trumbull, suggested that the liberty interests involved were intended to deal with these statutes:
“[Statutes of Mississippi ... provide that if any person of African descent residing in that State travels from one county to the another without having a pass or a certificate of his freedom, he is liable to be committed to jail and to be dealt with as a person who is in the State without authority. Other provisions of the statute prohibit any negro or mulatto from having fire *1118 arms; and one provision of the statute declares that for ‘exercising the functions of a minister of the Gospel free negroes ... on conviction, may be punished by ... lashes____’ [ ... ] The statutes of South Carolina make it a highly penal offense for any person, white or colored, to teach slaves; and similar provisions are to be found running through all the statutes of the late slaveholding States____ The purpose of the bill ... is to destroy all these discriminations.... ”
Adamson, 332 U.S. at 99-100, 67 S.Ct. at 1700 (quoting Cong. Globe, 39th Cong. 1st Sess. 474 (1865)). This does not suggest that the term “liberty” as used in the Fourteenth Amendment applies only to race-conscious statutes, indeed the plain language of the Fourteenth Amendment admits a broader interpretation. However, it does suggest a context in which to decide how to interpret the Amendment consistent with the drafters’ intent, a context that was not intended to include abortion.
I recognize that the Supreme Court has not accepted this approach. Indeed, the Court has recently held that such a fixed interpretive guideline is unhelpful in interpreting the Fourteenth Amendment. In Casey, the plurality stated that the Court should examine each case as it comes, ad hoc, to determine what substantive rights the Fourteenth Amendment guarantees, using “reasoned judgment.” Casey, 505 U.S. at 849, 112 S.Ct. at 2806. The power of Article III courts to invalidate state laws under the Constitution is not so expansive — even the reasoned judgment of our wisest jurists cannot replace the written constitution as authority.
Casey best illustrates the approach taken by the Supreme Court. Near the end of the plurality opinion, the Court says that “[ejach generation must learn anew that the Constitution’s written terms embody ideas and aspirations that survive more ages than one.” Casey, 505 U.S. at 901, 112 S.Ct. at 2833. This is in line with my earlier suggestion that old understandings apply to new situations and that the Constitution is limited by its words. But that is not what the Casey court actually did in the opinion. In deciding whether the abortion regulations at stake fell within the ambit of the Fourteenth Amendment, the court cited Justice Harlan’s dissent in Poe v. Ullman. Specifically the Court quoted two extensive passages of that opinion. First, the Court asserted that neither the Bill of Rights nor the specific practices of states at the time of the ratification of the Fourteenth Amendment marks the outer limits of substantive due process:
“[T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This ‘liberty’ is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press,' and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, ... and which also recognizes, whát a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgement.”
Casey, 505 U.S. at 848-49, 112 S.Ct. at 2805 (quoting Poe, 367 U.S. at 543, 81 S.Ct. at 1777 (Harlan, J., dissenting on jurisdictional grounds)). The Casey Court continued,, quoting from Poe, that the adjudication of substantive due process claims has traditionally been, and will continue to be, a matter of “reasoned judgment”:
“Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court’s decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them. The balance of which I speak is the bal *1119 anee struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound. No formula could serve as a substitute, in this area, for judgment and restraint.”
Casey, 505 U.S. at 849-50, 112 S.Ct. at 2806, (quoting Poe, 367 U.S. at 542, 81 S.Ct. at 1776 (Harlan, J., dissenting on jurisdictional grounds)). The two block quotes selected by the Court from Poe are perhaps more telling for what they omitted, however. For between these two long, lofty (and transposed) quotes in Poe, lie two telling sentences. After the above-quoted sentence, “No formula could serve as a substitute, in this area, for judgment and restraint!,]” Justice Harlan continued:
It is this outlook which has led the Court continuingly to perceive distinctions in the imperative character of Constitutional provisions, since that character must be discerned from a particular provision’s larger context. And inasmuch as this context is not one of words, but of history and purposes, the full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution.
Poe, 367 U.S. at 543, 81 S.Ct. at 1777 (Harlan, J., dissenting on jurisdictional grounds) (emphasis added). This omitted quote highlights Justice Harlan’s approach, employed by the Casey Court, of using history and tradition in general, not the written Constitution, to delimit the Fourteenth Amendment. See also Griswold, 381 U.S. at 501, 85 S.Ct. at 1691 (Harlan, J., concurring) (rejecting Justice Douglas’s restriction of substantive due process to the Bill of Rights and suggesting that judicial restraint may be achieved in the Fourteenth Amendment context “only by continual insistence upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms.”).
The Court is no longer interpreting the words of the Constitution; after Casey it is interpreting history. Words such as “rational continuum,” “substantial arbitrary impositions,” “purposeless restraints,” and “balance ... which our Nation has struck” are code words intended to evoke emotional and rhetorical fealty, yet they have no meaning independent of that given them by five Justices. The people’s Constitution — at least as to unenumerated constitutional rights — has become the Court’s Constitution. Those principles most conducive to the people’s happiness now come not from the people, but from Platonic guardians. Justice Black has been proven right, arguing in his dissent in Gris-wold against such an ambitious use of the Due Process Clause: “For myself it would be most irksome to be ruled by a bevy of Platonic Guardians, even if I knew how to choose them, which I assuredly do not.” Griswold, 381 U.S. at 526-27, 85 S.Ct. at 1705 (Black, J., dissenting) (quoting Learned Hand, The Bill of Rights 70 (1958)).
As the Supreme Court said in Bowers v. Hardwick, “The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution.” 478 U.S. 186, 194, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986). Interestingly, the Court does not even conduct such a historical review in Casey to bolster Roe’s “doctrinal footing,” nor does it accept or refer to the history cited in Roe as compelling. See Casey, 505 U.S. at 849-50, 112 S.Ct. at 2806.
B
In part because of the Supreme Court’s ambiguity about the scope of substantive due process, it is unclear to me that the Court itself still believes that abortion is a “fundamental right” under the Fourteenth Amendment. In the narrow context of this concurrence, I will not canvas the Supreme Court’s entire line of abortion cases. For the purposes of this opinion, it is necessary only to point out that the Court’s more recent deei *1120 sions indicate tepid support for Roe v. Wade. If Roe is no longer the best interpretation of the Constitution, then our authority to strike the Louisiana statute is very tenuous.
In Planned Parenthood v. Casey, the Court in a fractured joint opinion upheld Roe’s “central holding,” but did not defend Roe as a sound reading of the Constitution. 505 U.S. at 860-61, 112 S.Ct. at 2812. Instead, it upheld Roe out of concerns for the abstract, noneonstitutional value of stare decisis, for the institutional credibility of the Court, and because of the primacy of settled expectations about constitutional law. Id. (“Within the bounds of normal stare decisis analysis, then, and subject to the considerations on which it customarily turns, the stronger argument is for affirming Roe’s central holding, with whatever degree of personal reluctance any of us may have____”).
The joint opinion in Casey was correct to consider the force of precedent and the value of settled expectations. However, I think that the Court would have been more in line with the Constitution had it given effect to its conclusion that Roe is wrong. Where the Constitution is the source of a court’s power, it must interpret the Constitution first and consider institutional credibility second. Where, for example, the Court finds that it does not have the constitutional authority to strike a state law, its own prior opinions (especially erroneous ones) do not grant that authority, stare decisis notwithstanding.
The Casey Court asserted that it should not overrule cases, especially cases such as Roe, lightly. It explained: “a decision to overrule should rest on some special reason over and above the belief that a prior ease was wrongly decided.” Casey, 505 U.S. at 864, 112 S.Ct. at 2813, (citing Mitchell v. W.T. Grant Co., 416 U.S. 600, 636, 94 S.Ct. 1895, 1914, 40 L.Ed.2d 406 (1974) (Stewart, J., dissenting)); Mapp v. Ohio, 367 U.S. 643, 677, 81 S.Ct. 1684, 1703, 6 L.Ed.2d 1081 (1961) (Harlan, J., dissenting). But these dissents do not impress upon me why the Supreme Court (or any Article III court) should derive the authority to evaluate state laws under its own precedents and not under the best reading of the Constitution. What more should the Court need in order to overrule a prior case than its studied conclusion, based on the words of the Constitution, that the case had been wrongly decided?
Roe and its progeny, including Bellotti II, have always stood on precarious constitutional footing for the reasons I indicated in the last section. After Casey, these cases may not even be constitutional law. They might best be considered vestigial precedents propped up only by the judicial creation of stare decisis.
II
Perhaps because of the difficulties of restricting substantive due process, the Supreme Court assumed what can only be called legislative duties in Bellotti v. Baird, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (“Bellotti II”). In Bellotti II, the Supreme Court addressed the constitutionality of a Massachusetts statute restricting minors’ access to abortion. The Bellotti II Court held that minors have the same abortion rights as women who have reached the age of majority, and that the Massachusetts’s parental consent law unduly burdened minors’ exercise of that right. Bellotti II, 443 U.S. at 647, 99 S.Ct. at 3050. But the Court did not stop there. It continued, stating that the Court’s interpretation of the word “liberty” in the Fourteenth Amendment required that, when states seek to regulate minors’ access to abortions,
every minor must have the opportunity — if she so desires — to go directly to a court without first consulting or notifying her parents. If she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent. If she fails to satisfy the court that she is competent to make this decision independently, she must be permitted to show that an abortion nevertheless would be in her best interests. If the court is persuaded that it is, the court must authorize the abortion.
Id. at 647-48, 99 S.Ct. at 3050. The Court thus decided that a minor seeking an abortion without parental consent must be af *1121 forded a prompt hearing in court; must be allowed to have an abortion if the court decides she is mature enough to make the decision herself; and must be allowed to proceed if the court determines an abortion is in her best interests. Id. Regardless of whether that is good policy, I am not confident that there is a principled way to reach that conclusion from the word “liberty” in ■ the Fourteenth Amendment. By promulgating specific, minimum requirements for state parental consent statutes despite a complete vacuum of Constitutional authority, the Court’s opinion in Bellotti II has the distinct flavor of judicial legislation.
Bellotti II addresses policy concerns with parental consent statutes, elevates those concerns to constitutional heights, then declares Massachusetts’s nonconforming policy decisions to be unconstitutional. This line of reasoning amounts to little more than a tautology. By positing a fundamental right to abortion and by classifying regulations that jurists deem unwise as an “undue burden” on that right, federal judges risk constitutionalizing their policy preferences regarding any of the catalogue of substantive Fourteenth Amendment rights.
As one might expect, such backward induction yields conflicting and seemingly arbitrary results. For example, we are instructed in Bellotti II that parental consent requirements are unconstitutional, 443 U.S. at 649-50, 99 S.Ct. at 3051, yet in Casey we are told that the Constitution does not invalidate informed consent requirements, 505 U.S. at 887, 112 S.Ct. at 2826. In Akron I, we learn that women have a fundamental right to an abortion that prohibits states from imposing a twenty-four hour waiting period, Akron v. Akron Center for Reprod. Health, 462 U.S. 416, 450, 103 S.Ct. 2481, 2503, 76 L.Ed.2d 687 (1983), while in Casey we learn that “liberty” does not prohibit such a twenty-four hour waiting period, 505 U.S. at 885, 112 S.Ct. at 2824 (overruling Akron I). The Court’s different opinions about the best way to administer a “fundamental right” to abortion may be sensible; on the other hand they may not. But in any event they are not driven by the Constitution.
As illustrated by Bellotti II, the due process clause has become a blank check, redeemable for whatever rights the courts fashion. This is no rule of law, and it is certainly not constitutionalism. The Supreme Court’s abortion jurisprudence assures us that our panel has authority under the Constitution to strike portions of Louisiana’s parental consent statute. But because this jurisprudence no longer derives its force from the written Constitution, I hesitate to invoke Bellotti II to strike this law.
Ill
Aside from serious concerns about substantive due process, I have a pragmatic objection to courts substituting their judgments about this type of policy question for the decisions of legislatures. As I have asserted before, I think that the modern abortion cases are less about policy than about power. Sojourner T. v. Edwards, 974 F.2d 27, 31 (Garza, J., concurring specially) (quoting Casey, 505 U.S. at 981, 112 S.Ct. at 2874 (Scalia, J., dissenting in part)). The last two sections have outlined my belief that the Constitution has vested the power to decide these hotly contested, nonconstitutional issues in the state legislatures. See U.S. Const, amend. IX and X. In addition to my beliefs about the constitutional authority of Article III courts, I also think that these issues are better decided over time by democratic, political institutions. See generally Cass R. Sunstein, Foreword: Leaving Things Undecided, 110 Harv. L.Rev. 4 (1996) (arguing for narrow judicial decisions in cases involving constitutional and moral uncertainty).
The Supreme Court's abortion jurisprudence epitomizes a trend toward centralizing and constitutionalizing the most controversial issues of public policy. I believe that expanding the jurisdiction and power of the courts in order to speed the pace of change is unjustified. Where the Constitution does not dictate otherwise, the proper mode of political reform is through enlightened debate, political experimentation, and change. We are a pluralistic nation with strong individualist ideals. One large component of American civic virtue is public debate over issues. *1122 To be sure, this requires patience, because self-determination is not a guarantee of correctness the first time or every time. State legislatures will occasionally pass “silly” laws. See, e.g., Griswold, 381 U.S. at 527, 85 S.Ct. at 1705 (Stewart, J., dissenting). Some states may be slower than others in coming to what may eventually be a national consensus on an issue. But the ideal is that, through public discourse and experimentation, states will reconsider anachronistic laws, adapt, change, and find the public policies that work best. Where these issues are not constitutional, it demeans the ideal of democracy for the courts to decide these issues for the people, especially under a strained interpretation of the Constitution.
Some have justified an ambitious judicial role in abortion cases by suggesting that the Supreme Court has a special calling to unite the nation in high-stakes cases in which people passionately disagree. In Casey, the Court stated that such cases carry a special “dimension” that places those opinions in a class by themselves:
Where, in the performance of its judicial duties, the Court decides a case in such a way as to resolve the sort of intensely divisive controversy reflected in Roe and those rare, comparable cases, its decision has a dimension that the resolution of the normal case does not carry. It is the dimension present whenever the Court’s interpretation of the Constitution calls the contending sides of a national controversy to end their national division by accepting a common mandate rooted in the Constitution.
Casey, 505 U.S. at 866-67, 112 S.Ct. at 2815. The Court suggested that the two cases exemplifying this call to a common mandate were Roe v. Wade and Brown v. Board of Education. But as Justice Scalia pointed out in his Casey dissent, Roe did not settle the political issue of legalized abortion. No one accepted a common mandate in that case. In retrospect, it is clear that the Supreme Court’s intervention in the debate clouded the issues, inflaming those who believe that there is no constitutional right to abortion and forcing advocates of legalized abortion to defend abortion “rights” under Roe. Today we see that even many of those who believe that abortion should be legal do not support Roe v. Wade as faithful interpretation of the Constitution. See Casey, 505 U.S. at 860-61, 112 S.Ct. at 2812 (joint opinion reluctantly upholding Roe on stare decisis grounds); see also Ruth Bader Ginsburg, Some Thoughts on Autonomy and Equality in Relation to Roe v. Wade, 63 N.C. L.Rev. 375, 385-86 (1985) (criticizing the “[hjeavy handed judicial intervention” of the Roe court and suggesting an alternative starting point for analysis in abortion cases).
Roe did not mark the end of the debate or the acceptance of a common mandate, but the beginning of a bitter national exegesis. In this respect, Roe is more like Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), than Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) {Brown I). Plessy, like Roe, represented an attempt to read into the Constitution one view of history and social policy neither explicit nor fairly implied from the Constitutional text. “Separate but equal” may have been an attempt to solve a contentious issue of the 1890s, but it was not constitutional interpretation. Plessy did not unite the nation behind the idea that segregation was consistent with the Civil War Amendments. As in its abortion cases, the Court occasionally upheld the “central holding” of Plessy on stare decisis grounds, before finally overruling it in Brown I, 347 U.S. at 494-95, 74 S.Ct. at 691-92. I suggest this comparison not necessarily to draw any moral parallel between slavery and abortion, but rather to point out that the Court’s insertion of itself as the final arbiter of the abortion debate is unlikely to prove more successful than its attempt in Plessy.
Plessy is not the only time our nation has faced a conflict between faithful interpretation and stare decisis. We learned the same lesson about ambitious judicial intervention again in the early twentieth century, even in the same substantive due process context, in the line of cases following Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). In Lochner and its progeny, the Court established and upheld on stare decisis grounds the laissez-faire notion that state *1123 regulation of worker health and welfare violated the substantive due process rights of employers in liberty of contract. See, e.g., Adkins v. Children’s Hospital of District of Columbia, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923). The Court later overruled Adkins and signaled the end of the Lochner era in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), holding that the Due Process Clause did not contain implicit protections of absolute liberty of contract.
In fact, the very first substantive due process case tells the same story. In Dred Scott v. Sanford, 60 U.S. (How.) 393, 450, 15 L.Ed. 691 (1856), the Court held, among other things, that a slave owner did not lose his property interest in a slave when he traveled with the slave to a free state. In what could be described as the beginning of substantive due process, the Court held that a section of the Missouri Compromise, which would have recognized such slaves as free, was unconstitutional. The Court held that such governmental intrusion on private property rights, regardless of procedural safeguards, “could hardly be dignified with the name of due process of law.” Id. This was the first time since Marburg v. Madison that the Court used the power of judicial review, and the first time ever that the Court invalidated a statute under judicial review. That a notion as controversial as substantive due process sprang from such a cataclysmic opinion is revealing.
Dred Scott was fashioned as an opinion to put an end to a bitter dispute in America. It took one of the most contentious and personal of political issues out of the national debate. But instead of resolving controversies, Dred Scott tore the nation apart. Although Roe and its progeny have not resulted in a civil war, the peace over abortion since 1973 has been anything but civil. The last twenty years have seen political protest over the Court’s abortion jurisprudence unmatched by any other political issue of our day. Protest marches, clinic bombings, and fatal shootings have punctuated the debate. Putting the lid on this pot has caused it to boil over. Regular debate, lobbying, and legislation at the state level, as contemplated by the Constitution, may diffuse political pressure, relieve tensions, and provide for nuaneed answers to hard questions about abortion. Removing such issues from the people prevents their vetting at the local level and requires the political pressure to be released outside the bounds of civil debate.
In Dred Scott, Plessy, and Lochner, the Court made things worse by inserting itself into, and preempting, the national debate. Although at one time these eases were also defensible on stare decisis grounds, they are not celebrated eases in our history. By contrast, the cases in which the Court overruled such precedents, such as Brown I and West Coast Hotel, are celebrated as constitutional moments. It is of course easier to discern between the two types of eases in retrospect. I think that enough history has passed for us confidently to conclude that Roe belongs in the former category, eases in which the Court intervened to settle a national debate by way of expansive constitutional interpretation. It remains for our Supreme Court to write the analog to West Coast Hotel extricating itself from the substantive due process morass of abortion cases and returning the debate to the people.
Deliberation about this subject, although heated, is healthy. As a nation, we have not reached a consensus about when life begins; we have not finally determined the proper interplay between a mother’s liberty, the interests of an unborn child, and the state’s interests in protecting life. At an ontological level, we the people have yet to decide whether person defines life or life defines person. As technology allows fetal independence at an earlier and earlier age, our understanding of these questions will not remain static. The Constitution, in all its prescience, does not answer these questions. Such ontic questions are quintessentially the right of the people to decide. In abortion cases, law presupposes a theory of ethics and morality, which in turn presupposes deeply personal ideas about being and existence. Our answers to such questions as when life begins define our ethical beliefs, and these ethical beliefs should determine how we govern ourselves. It is a serious mistake to try to reverse this order, to make *1124 our law determine how we decide these fundamental, personal, ontic issues. Abortion in this context is less a question about constitutional law, and more about who we are as a people. I submit that this is a decision the Supreme Court cannot make. Liberty is not coextensive with license; it therefore must have limits. Those limits may be imposed only by the people, either in their Constitution or through their laws, not legislated by the courts. Taking these issues out of the public discourse threatens to foment hostility, stifle the search for answers, distance people from their Constitution, and undermine the credibility of that document.
IV
Bellotti II represents a type of legislating that is better left to Congress or the states. In many cases, the courts must fill in gaps in statutes, account for unforeseen circumstances, or decide difficult issues that legislators avoid. However, in this instance, Louisiana actually did exercise its legislative powers; it debated and straggled and made tough choices. Now we are nullifying Louisiana’s choice, not under the Constitution, but under Roe’s continuing authority based on stare decisis.
Therefore it is not impertinence that makes me question the Supreme Court’s abortion jurisprudence, but institutional modesty. I am uncomfortable invoking the authority of the Constitution to invalidate this statute, especially under such an ambiguous mandate from the Constitution. Although the Court said in Bellotti II that Roe and the Fourteenth Amendment set minimum standards for parental consent statutes, it is unclear that the post-Casey Supreme Court still believes that the Constitution demands this outcome. Overturning Louisiana’s legislature on such thin authority runs dangerously close to anticonstitutional hubris. As Abraham Lincoln said of Bred Scott:
The candid citizen must confess that if the policy of the government, upon vital questions affecting the whole people, is to be irrevocably fixed by decisions of the Supreme Court, the instant they are made, in ordinary litigation between parties in personal actions, the people will have ceased to be their own rulers, having, to that extent, practically resigned the government into the hands of that eminent tribunal.
Abraham Lincoln, First Inaugural Address — Final Text (Mar. 4, 1861), in 4 The Collected Works of Abraham Lincoln 262, 268 (Roy P. Basler ed., 1953) (cited in Casey, 505 U.S. at 996, 112 S.Ct. at 2882 (Sealia, J., dissenting in part)).